**Affirmed as Modified in Part; Reversed and Remanded in Part; and Opinion and Dissenting Opinion filed June 26, 2014.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-12-00941-CV

---

## UNITED NATIONAL INSURANCE COMPANY, Appellant

### V.

## AMJ INVESTMENTS, LLC, Appellee

---

**On Appeal from the 269th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2010-37580**

---

## O P I N I O N

After a seven-story office building was damaged by Hurricane Ike, the building's owner and its property insurer disputed the amount that the insurer should pay under the insurance policy. A jury agreed with the owner that the insurer failed to pay the full amount due, and the insurer appealed the judgment awarding the owner compensatory damages, exemplary damages, and enhanced interest under the prompt-payment statute.

We conclude that the evidence supports the jury's findings that:

- the insurer failed to attempt a good-faith settlement of the claim when its liability was reasonably clear,

- the insured is entitled to recover $300,000.00 in compensatory damages despite the absence of an independent injury, and

- the insured's bad-faith conduct was committed knowingly.

We conclude, however, that:

- the additional interest for the insurer's violation of the prompt-payment statute was improperly calculated, and
- the evidence of reasonable and necessary attorney's fees through the conclusion of trial was insufficiently specific to sustain the award.

We therefore affirm the awards of compensatory and exemplary damages; modify the award of enhanced interest; reverse the award of trial attorney's fees; and remand the case for redetermination of trial attorney's fees and for entry of judgment not inconsistent with this opinion.

## I. BACKGROUND

AMJ Investments bought a seven-story office building in April 2008 and insured it for its replacement value of $4 million with United National Insurance Co. Jacob Monty, AMJ's owner, inspected the building with an engineer and an architect before the purchase and found no signs of improper maintenance. On September 13, 2008, Hurricane Ike damaged the building. Monty drove by the building the next day, saw some broken windows and debris, and telephoned the claim to his insurance agent. United paid AMJ insurance proceeds of $2,191,627.48 by March 16, 2009 and paid a further $222,000.00 on or about November 23, 2009. The parties disagree about whether United should have paid a larger total amount and should have paid more by March 16, 2009.

## A. The Initial State of the Building

When Monty was able to enter the building two days after the hurricane, there was about fourteen feet of water in the basement, and the water meter on the side of the building was spinning. At some point, it was discovered that some of the copper plumbing pipes and one of the sump pumps had been stolen from the basement, but the evidence is conflicting about whether the theft occurred on the day after the hurricane or after the water was already pumped out of the basement.

At unspecified locations throughout the building, water entered through cracked seals around the windows. Experts disagreed about whether the seals failed due to improper maintenance or due to the force of the wind during the hurricane. Additional water entered through two broken windows on the first floor, and both sides attributed that damage to the hurricane.

On top of the building, the elevator shaft culminated in a projecting "penthouse," so that the building had a "main roof" and a "penthouse roof," both of which were damaged. Rain entering through both the penthouse roof and the main roof damaged the seventh floor. In addition, rain entering through the damaged penthouse roof traveled down the elevator shaft to the basement, damaging the shaft and nearby areas and contributing to the water damage in the basement. Both parties attributed this damage to the hurricane. On the main roof, the wind also moved a cell-phone-antennae system several feet, damaging the roof below. The parties disagreed about whether the main roof suffered hurricane-related damage beyond this relatively small area.

## B. The Claim Investigation and Payment

United hired independent adjuster Clay Sheffield to investigate the loss, and Monty hired public adjuster Gary Krone to represent AMJ's interests and negotiate the claim's settlement with United. While these activities were taking place, AMJ's agents

hired subcontractors to take steps to dry the building and prevent further damage, and United approved at least some advance payments to assist with that effort.

Sheffield testified that he was told that the sprinklers on the first floor had turned on and flooded that floor and the basement. He later learned of the theft of the copper piping and a sump pump, and concluded that much of the basement's water damage fell within the policy's theft exclusion.

As for the windows, Sheffield initially thought that water entered because the force of the wind broke the surrounding seals. After inspecting the roof, he believed that the penthouse roof needed to be replaced, but that the main roof sustained only minor damage. He believed that water damage to the upper floors was the result of water entering through the penthouse roof.

United authorized Sheffield to hire a "cause and origin" expert to assist in the investigation, and Sheffield retained Rimkus Consulting. Three engineers employed by that company produced a report in which they concluded that some water damage on every floor was caused by rain entering through the penthouse roof and traveling down the elevator shaft, but that water damage around the unbroken windows occurred because the window seals were improperly maintained.

United or Sheffield also hired building consultant Stephen Johnson of Unified Building Services to help prepare an estimate for repairs. Johnson estimated that the total cost of repairs would be $1,633,536.24. It is unclear whether this amount was intended to include the $700,000.00 that United had advanced to AMJ or was to be in addition to that amount. In any event, Krone agreed with Johnson's estimate. Sheffield subsequently prepared his own estimate. He also prepared a proof-of-loss form, which AMJ's owner executed on March 10, 2009; however, the numbers in the form were not taken from Johnson's estimate, but were taken from Sheffield's estimate, which Krone had never seen. On March 16, 2009, United sent Krone checks for more than $1.4

million. When added to AMJ's deductible and to the payments that United had already advanced, these checks made the total amount of the property-damage claim paid by March 16, 2009 equal to the amount stated in Sheffield's estimate.

At some point, Krone asked United to pay an additional $250,000.00, but there is conflicting evidence about whether the "supplemental claim" was made before or after March 16, 2009.[1] The parties disagreed about whether the damage intended to be addressed by the payment was caused by the hurricane, and in November 2009, they reached a compromise in which AMJ agreed to accept payment of $222,000.00. United then asked AMJ to sign a full and final release reciting that in consideration of United's payment of $2,413,627.48 (i.e., the combined total of amounts paid on the property-damage claim), AMJ released United from any further liability for the wind damage to the building. AMJ refused to sign, but United paid the agreed amount anyway.

AMJ made no further demands for policy proceeds, but sued United seven months later for breach of contract and bad faith.

## C. The Trial

Although the parties presented opposing experts on the cause and extent of damages, this appeal focuses primarily on the evidence of the costs to repair or replace any covered damage. AMJ's expert Art Boutin used the Xactimate software program to prepare an estimate of these costs; Sheffield and Johnson had used the same program to produce their estimates. According to Boutin, the total amount that United should have paid on the claim was more than $3.4 million.

The jury was not wholly persuaded by either side's position on damages. It found that United failed to comply with the policy and that the difference between the amount

---

[1] On appeal, AMJ denies that this was a "supplemental claim," but because both sides chose to use this term during trial, we continue the convention on appeal without attaching particular legal significance to that choice.

of damages covered under the policy and the amount paid was $300,000.00. The jury also found that United engaged in two types of conduct constituting bad faith: "[a]ttempting to enforce a full and final release of a claim from a policyholder when only a partial payment has been made, unless the payment is a compromise settlement of a doubtful or disputed claim," and "failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim when [its] liability has become reasonably clear." The jury found that "[p]olicy benefits for repair or replacement of AMJ's property due to damage to the property covered under [the] policy" was $300,000.00. It also assessed an additional $1 million in damages based on its finding that United knowingly violated the Insurance Code. Finally, the jury assessed attorney's fees of $99,300.00 through the date of trial, additional fees of $30,000.00 for an intermediate appeal, and further fees of $30,000.00 for an appeal to the Texas Supreme Court.

The jury was not asked to make any findings about the date on which United was required to pay insurance proceeds; nevertheless, AMJ asked the trial court to include in the judgment prompt-payment penalties beginning from March 16, 2009. The trial court did so over United's objection, rendering judgment in the amounts of $300,000.00 for violations of the Texas Insurance Code, $178,734.00 in prompt-payment penalties, and $600,000.00 for knowing conduct,[2] together with attorney's fees, costs, and interest. The trial court denied United's motions for judgment notwithstanding the verdict and for new trial.

## II. ISSUES PRESENTED

In its first issue, United challenges the legal and factual sufficiency of the evidence to support the award of compensatory damages. In its second and third issues,

---

[2] These damages were reduced pursuant to a statutory cap. *See* TEX. INS. CODE ANN. § 541.152(b) (West Supp. 2013).

6

United contends that AMJ sustained no injury independent of its claim for policy proceeds, and thus, AMJ's claims under the Insurance Code are both precluded as a matter of law and unsupported by the evidence. In its fourth and fifth issues, United challenges the evidence supporting each of the jury's findings that United acted in bad faith. United contends in its sixth issue that there is legally and factually insufficient evidence that it violated the Insurance Code knowingly. In its seventh issue, United asserts that AMJ is not entitled to recover prompt-payment penalties because it failed to submit any jury question to support such an award. Finally, United argues in its eighth issue that the evidence is legally insufficient to support the award of attorney's fees.

## III. STANDARD OF REVIEW

When analyzing a challenge to the legal sufficiency of the evidence, we consider the evidence in the light most favorable to the verdict and indulge every reasonable inference that would support the challenged finding, crediting favorable evidence if a reasonable factfinder could and disregarding contrary evidence unless a reasonable factfinder could not. *See City of Keller v. Wilson*, 168 S.W.3d 802, 820, 827 (Tex. 2005). We will sustain a legal-sufficiency challenge only when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact. *Id.* at 810. We cannot substitute our judgment for that of the trier of fact if the evidence falls within this zone of reasonable disagreement. *Id.* at 822. If the evidence viewed in this light would enable reasonable and fair-minded people to find the challenged fact, then the evidence is legally sufficient. *See id.* If more than a scintilla of competent evidence supports the challenged finding, we will uphold it. *Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 830 (Tex. 2009).

7

When analyzing a factual-sufficiency challenge, we consider and weigh all the evidence, setting aside a verdict only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and manifestly unjust. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761–62 (Tex. 2003). The jury as the trier of fact is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *City of Keller*, 168 S.W.3d at 819. Thus, we may not substitute our own judgment for that of the factfinder, even if we would reach a different answer on the evidence. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998). The amount of evidence necessary to affirm the factfinder's judgment is far less than that necessary to reverse its judgment. *Jones v. Smith*, 291 S.W.3d 549, 555 (Tex. App.—Houston [14th Dist.] 2009, no pet.).

## IV. ANALYSIS

Although United prevailed on both its breach-of-contract and its bad-faith claims, the damages awarded under these theories were identical, and AMJ chose to recover on its bad-faith theory of liability. We accordingly begin our analysis with that finding.

**A.    The evidence is legally and factually sufficient to support the finding that United "[failed] to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim when [its] liability has become reasonably clear."**

United argues that there is legally and factually insufficient evidence that its liability was "reasonably clear" because it was entitled to rely on the advice of Sheffield and other experts who advised United that some of the damages were due to causes other than the hurricane. Moreover, the jury was asked whether United failed to conduct a reasonable investigation, and the jury answered, "no." AMJ nevertheless maintains that United was not entitled to rely on its experts because they were biased and conducted superficial investigations to provide a pretext for United to conclude that much of the damage was not covered by the policy. *See State Farm Lloyds v. Nicolau*,

8

951 S.W.2d 444, 448 (Tex. 1997) (holding that evidence was legally sufficient to support finding that the insurer "denied the claim without a reasonable basis or without attempting to objectively determine whether its liability had become reasonably clear" where the evidence supported inferences that the expert's reports were not objectively prepared; that the insurer was aware of the lack of objectivity; and that the insurer's reliance on the reports was pretextual).

It is possible to resolve this issue without detailing the extensive evidence from expert witnesses on both sides, because even if the extent of United's liability was a matter on which qualified and unbiased experts differed, the record contains other evidence that independently supports the challenged finding: reasonable jurors could have concluded that (1) the parties agreed that United would pay for the costs of repair in accordance with Johnson's estimate, thereby making United's liability "reasonably clear"; and (2) by paying repair costs in accordance with Sheffield's estimate rather than in accordance with Johnson's estimate as agreed, United failed to attempt in good faith to effectuate a prompt, fair, and equitable settlement.

First, the record supports the existence of an agreement to pay for the costs of repairs as set forth in Johnson's estimate. Krone testified that he agreed with United to the scope and costs of repairs as stated in Johnson's estimate. United's director of property claims similarly testified that if United hired a building consultant to prepare an estimate for the work to be performed, then she expected that United would resolve the claim based on that estimate. United repeatedly represented that the amounts it paid were the amounts that its insured agreed to accept.

Second, the record demonstrates that instead of paying in accordance with Johnson's estimate, United instead paid the exact amount in Sheffield's estimate. Johnson's estimate includes the costs of repairing damage, but does not include payments for work performed to prevent further damage. The jury reasonably could

9

have concluded that Krone and Johnson intended Johnson's estimate to represent their agreement only as to the costs of repairing the remaining damage, leaving the previously-incurred costs of preventing further damage to be added to that amount. In contrast, Sheffield's estimate included payment of over $900,000.00 to the two subcontractors who performed the initial work of drying the building and preventing further damage.[3] If jurors subtracted those payments from Sheffield's estimate in order to make an "apples-to-apples" comparison of the costs of repair in the two estimates, then Johnson's estimate is seen to be more than $300,000.00 larger than Sheffield's estimate.

Because the evidence viewed in the light most favorable to the verdict supports such a basis for liability, it is legally sufficient; because the evidence viewed in a neutral light supports the finding, it is factually sufficient. We therefore overrule this issue, making it unnecessary for us to address United's challenge to the jury's second statutory-liability finding.

**B.    The evidence is legally and factually sufficient to support the award of compensatory damages.**

United argues that the evidence is legally and factually insufficient to support the award of compensatory damages because everyone who offered an opinion about the amount that it should pay relied on estimates prepared on the Xactimate software program, and no one testified that these amounts represented the reasonable and necessary costs to repair or replace damaged property. In support of this argument, United relies on *McGinty v. Hennen*, 372 S.W.3d 625 (Tex. 2012) (per curiam).

*McGinty* concerns the evidence necessary to support an award of "remedial damages," that is, damages awarded to remedy some wrong or defect. *Id.* at 627. In

---

[3] One of AMJ's duties in the event of a loss was to "[t]ake all reasonable steps to protect the Covered Property from further damage, and keep a record of [AMJ's] expenses necessary to protect the Covered Property, for consideration in the settlement of the claim."

10

that case, a builder's breach of a construction contract caused water leaks in the plaintiff's home, which in turn caused mold damage. *Id.* at 626. The jury found that the reasonable and necessary costs to repair the home were more than $651,000.00. *Id.* The finding was based on a contractor's testimony about the estimated costs of repair he calculated using the "Exactimate" software program. *Id.* at 627. He also stated that "because not every price issued by the program is right, 'we have to cross-reference and double check all our pricing,'" obtaining some costs "'from subcontractors or historical data or jobs.'" *Id.*

The Texas Supreme Court reversed, explaining, "Estimated out-of-pocket expenses, like paid out-of-pocket expenses, do not establish that the cost of repair was reasonable. Some other evidence is necessary." *Id.* at 627–28; *see also Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 201 (Tex. 2004) (per curiam) ("'[I]t is now well settled that proof of the amounts charged or paid does not raise an issue of reasonableness, and recovery of such expenses will be denied in the absence of evidence showing that the charges are reasonable.'" (quoting *Dallas Ry. & Terminal Co. v. Gossett*, 294 S.W.2d 377, 383 (Tex. 1956))).

There are a number of striking similarities between this case and *McGinty*. The experts in this case relied on estimates prepared using the "Xactimate" software program, which is distinguishable from the program described in *McGinty* only by its spelling, and may in fact be the same program. The jury in this case heard testimony that Xactimate is an insurance "industry standard"; the jury in *McGinty* heard that Exactimate is "used widely in the insurance industry." *McGinty*, 372 S.W.3d at 627. The expert who prepared the plaintiff's Xactimate estimate in this case relied on reports of detailed inspections by PE Services and Mike Krismer concerning the scope of damage and necessity of repairs—coincidentally, so did the contractor who prepared the Exactimate estimate in *McGinty*. *See Hennen v. McGinty*, 335 S.W.3d 642, 646, 654

11

(Tex. App.—Houston [14th Dist.] 2011), *rev'd*, 372 S.W.3d 625 (Tex. 2012) (per curiam). And here, as in *McGinty*, no one specifically testified that the plaintiff's estimated costs of repair were reasonable and necessary.

But this case differs from *McGinty* in three dispositive respects: (1) this jury was not asked to find the reasonable and necessary cost of repair; (2) here, *both* sides relied on the same software program when calculating the cost of repairing or replacing damaged property that was covered under the policy; and (3) there is evidence the parties agreed that the costs of repair or replacement would be the amount as calculated in a particular Xactimate estimate.

First, we must measure the sufficiency of the evidence by the charge given. *McGinty*, 372 S.W.3d at 628. In *McGinty*, the jury was asked to find "the reasonable and necessary cost to repair" the property. *Id.* at 626. Here, the jury was instructed to find the "[p]olicy benefits for repair or replacement of AMJ's property due to damage to the property covered under United National's policy." Neither party objected to the trial court's failure to charge the jury to find the "reasonable and necessary costs for repair or replacement," and United does not argue that this portion of the charge is erroneous. Because we must measure the sufficiency of the evidence by the charge, the evidence supporting a jury's finding of the costs to repair or replace property is not legally insufficient where the jury was not instructed to find "the reasonable and necessary" costs. *Shows v. MAN Engines & Components, Inc.*, 364 S.W.3d 348, 357–58 (Tex. App.—Houston [14th Dist.] 2012), *aff'd on other grounds*, 57 Tex. Sup. Ct. J. 661, 2014 WL 2535963 (June 6, 2014).[4]

---

[4] The dissent would hold that *McGinty* still applies even though the jury was not asked to find "the reasonable and necessary cost of repair" because the jury was asked to find the amount that "would fairly and reasonably compensate" the plaintiff. But the jury in *Shows* also found that the damages it assessed "would fairly and reasonably compensate" the plaintiff, and we nevertheless held that because the jury was not asked to determine the "reasonable and necessary costs of repair," the absence of such evidence did not render the evidence legally insufficient. *See id.* We are bound to

12

Second, the evidence is uncontroverted that United paid what it did pay based on the Xactimate program. United determined the policy benefits to pay based on Xactimate and the jury was asked to determine, in effect, if United underpaid. Because United's own experts supported the use of Xactimate to determine payment of policy benefits, United should not now be heard to complain that the opposing experts did the same. In fact, if Xactimate provides no evidence of the reasonable costs to repair or replace damage covered under the insurance policy, then United breached its policy by using Xactimate to determine the amount to pay. Because United chose to rely on Xactimate when determining the amount it would pay, the jury was entitled to conclude that it is fair and reasonable to use the same method when determining the difference between that amount and the amount it *should* have paid.

Third, the jury heard evidence from both sides that the parties agreed AMJ would be paid the amount stated in Johnson's Xactimate estimate for the costs of repairing or replacing the damaged property. As Krone testified, "I agreed on the scope of what was being done. . . . I agreed with [Johnson] on the scope items, and then we let the Xactimate estimating program determine the amount of the cost." The jury was permitted to consider this agreement in assessing damages. Jurors were asked to determine the amount that "would fairly and reasonably compensate AMJ for its damages, if any, that were caused by such unfair or deceptive act or practice." They were instructed to measure the damages by "[p]olicy benefits for repair or replacement of AMJ's property due to damage to the property covered under [United's] policy." Krone's testimony is evidence that the parties agreed that "[p]olicy benefits for repair or replacement" would be determined using Xactimate, and that the costs for such repair or replacement were as stated in Johnson's Xactimate estimate. Moreover, it is stated in the "loss payment" section of United's policy, "We will pay for covered loss or damage

follow that precedent. *See Taylor v. First Cmty. Credit Union*, 316 S.W.3d 863, 869 (Tex. App.—Houston [14th Dist.] 2010, no pet.).

13

within 30 days after we receive the sworn proof of loss, if you have complied with all of the terms of this Coverage Part and . . . [*w*]*e have reached agreement with you on the amount of loss . . . .*" (emphasis added).

The policy therefore contemplated just the sort of agreement addressed by the evidence in this case, and as previously discussed, jurors could have concluded that United engaged in a false, deceptive, or unfair practice precisely because it secured Krone's agreement based on the scope and costs of repairs in one estimate, but then paid in accordance with an estimate Krone had not seen, while continuing to represent that it was paying as agreed. Under these circumstances, jurors were entitled to use Johnson's Xactimate estimate—even in the absence of expert testimony that it provided the reasonable and necessary costs of repair or replacement—because the parties agreed to use it. In effect, the jury was entitled to conclude that it was fair and reasonable to hold United to its agreement.

Viewing the record in the light most favorable to the verdict, the evidence is legally sufficient to support the jury's finding; viewing the evidence in a neutral light, it is factually sufficient to support the finding. We accordingly overrule this issue.[5]

## C.     The absence of a separate injury does not prevent AMJ from recovering amounts due under the policy as damages for an Insurance Code violation.

United additionally points out that the jury assessed identical damages for failure to comply with the policy and for violations of the Insurance Code, and argues that AMJ cannot recover on its statutory claim because such conduct did not cause AMJ any injury independent of the injury caused by United's breach of contract. We disagree with United's premise. Under the circumstances presented here, the absence of an independent injury does not foreclose liability for United's violation of the Insurance Code.

---

[5] United does not challenge the amount of the compensatory damages assessed by the jury.

A property insurer's "unfair refusal to pay the insured's claim causes damages as a matter of law in at least the amount of the policy benefits wrongfully withheld." *Vail v. Tex. Farm Bur. Mut. Ins. Co.*, 754 S.W.2d 129, 136 (Tex. 1988). If a property insurer fails to pay the full amount of the claim as a result of an unfair claim-settlement practice under the Insurance Code, the insured may elect to recover its damages under either a breach-of-contract or a statutory-violation theory. *See Waite Hill Servs., Inc. v. World Class Metal Works, Inc.*, 959 S.W.2d 182, 184–85 (Tex. 1998) (per curiam) (holding that where the insurer's breach of the policy, its violations of the DTPA and the Insurance Code, and its breach of the duty of good faith and fair dealing all caused a single injury—failure to pay the amount due—the insured was required to elect one of these theories on which to recover).

United argues that in the absence of an independent injury, "judgment cannot be rendered under the Insurance Code *for amounts owed under the policy*." (emphasis added). This is contrary to the both *Vail* and *Waite Hill Services*, and is not supported by the only decision by the Texas Supreme Court on which United relies. *See Provident Am. Ins. Co. v. Castañeda*, 988 S.W.2d 189 (Tex. 1998). In *Castañeda*, the insured did not allege or obtain findings that the insurer breached the health-insurance contract at issue. The insured argued that she nevertheless was entitled to damages equivalent to policy benefits if the insurer failed to acknowledge communications or to adopt reasonable standards for investigating claims. *Id.* at 198. The court rejected the argument, citing *Republic Insurance Co. v. Stoker*, 903 S.W.2d 338, 341 (Tex. 1995). There, the court stated, "As a general rule there can be no claim for bad faith when an insurer has promptly denied a claim *that is in fact not covered*." *Id.* (emphasis added). The court nevertheless allowed for "the possibility that in denying the claim, the insurer may commit some act, so extreme, that would cause injury independent of the policy claim." *Id.* Applying the rationale of *Stoker*, the *Castañeda* court held that "none of the

15

actions or inactions of [the insurer] was the producing cause of any damage separate and apart from those that would have resulted from a wrongful denial of the claim . . . ." *Castañeda*, 988 S.W.2d at 198.

Unlike the insured in *Castañeda*, the insured in this case pleaded and proved that its claim was covered and its insurer breached the contract. Consequently, and as a matter of law, United's failure to pay when its liability was reasonably clear caused AMJ to be damaged in an amount at least equal to the amount of the insurance proceeds that were wrongfully withheld. *See Vail*, 754 S.W.2d at 136. We accordingly overrule these issues.

**D.    There is legally and factually sufficient evidence that United knowingly violated the Insurance Code.**

Having found that United engaged in at least one unfair or deceptive practice, the jury was asked to determine if United engaged in such conduct "knowingly." The trial court correctly instructed the jury that "'[k]nowingly' means actual awareness of the falsity, unfairness, or deceptiveness of the act or practice on which a claim for damages is based. Actual awareness may be inferred if objective manifestations indicate that a person acted with actual awareness." *See St. Paul Surplus Lines Ins. Co. v. Dal-Worth Tank Co.*, 974 S.W.2d 51, 53 (Tex. 1998) (per curiam). The jury found that United did act "knowingly," and United contends that, for three reasons, the evidence is legally and factually insufficient to support the finding.

First, United argues that it could not have knowingly failed to settle the claim when its liability was reasonably clear because there is no evidence that its liability was "reasonably clear." As previously explained, however, a reasonable jury could have concluded that United agreed to pay for the costs of repair or replacement as set forth in Johnson's estimate, thereby making its liability reasonably clear.

Second, United states that reliance on expert advice is not evidence of bad faith.

This is not necessarily true; in some circumstances, reliance on expert advice can be evidence of bad faith. *See State Farm Fire & Cas. Co. v. Simmons*, 963 S.W.2d 42, 44 (Tex. 1998) (holding that the evidence was legally sufficient to support a finding of bad faith where the insurer denied the insured's claim "based upon a biased investigation intended to construct a pretextual basis for denial"); *Nicolau*, 951 S.W.2d at 448 ("[R]eliance upon an expert's report . . . will not necessarily shield the carrier if there is evidence that the report was not objectively prepared or the insurer's reliance on the report was unreasonable. . . . [E]vidence casting doubt on the reliability of the insurer's expert's opinions may support a bad-faith finding."). Although United argues that it properly relied on Sheffield's opinion and on the expert report prepared by Rimkus engineers, there is evidence that United agreed to pay for repairs as set forth in Johnson's estimate. The jury reasonably could have concluded that once United and Krone reached this agreement, it was no longer reasonable for United to rely on the contrary opinions of other experts.

Third, AMJ argues that there are no objective manifestations indicating that United acted with actual awareness of the deceptive or unfair nature of its conduct, because "[t]he only objective manifestations consisted of communications between the parties and their respective adjusters and representatives . . . ." But viewed against the backdrop of the parties' agreement regarding Johnson's estimate, the jury reasonably could conclude that those communications support an inference of knowing misconduct.

To illustrate, Krone testified that he disagreed with Sheffield's initial statements about the scope of damage to the roof; Krone believed that the main roof was extensively damaged and should be replaced, but Sheffield felt that only the penthouse roof needed replacement. Krone further testified that after United retained Johnson as a building consultant, Krone and Johnson were able to agree about the scope of the damage and the costs of repair in his estimate, which included funds to remove and

17

replace the entire roof. But documents presented at trial showed that after Johnson completed his estimate, Sheffield prepared his own estimate that called for replacement of the penthouse roof, but not the main roof. Correspondence between United and Sheffield—and later, correspondence between United and AMJ—show that despite the agreement to use Johnson's estimate, United actually paid in accordance with Sheffield's estimate.

This was not all. At trial, United's corporate representative testified that there was not an estimate from Sheffield in the file. As she explained it, "we hired [Johnson] to prepare an estimate and his note says [remove and replace] roof and that's how he prepared his estimate, then that's what we would have paid." But this testimony is contradicted by United's later correspondence with AMJ. In January 2010, after United made its final payment on the claim and Krone was no longer actively representing AMJ, AMJ's owner contacted United and asked for the experts' reports, and in response, United sent both estimates. In United's accompanying letter, it referred to Johnson's estimate as the "initial estimate of the damages" and to Sheffield's estimate as the "final estimate." Although United represented to AMJ that Krone had actually agreed with the amounts paid, Krone had never seen Sheffield's estimate and insisted that he never agreed that United was not required to pay for replacement of the entire roof.

We conclude that, viewed under the appropriate standard of review, the evidence is both legally and factually sufficient to support the jury's finding that United acted "knowingly." We overrule this issue.

**E.    AMJ did not conclusively establish that enhanced interest began to accrue any earlier than 75 days after United's last payment.**

United challenges the award of 18% interest on the compensatory damages found by the jury. Such enhanced interest is one of the remedies available for violation of the

prompt-payment provisions of the Insurance Code. The "Prompt Payment of Claims" subchapter of the Insurance Code imposes a number of claim-handling deadlines and provides that if an insurer fails to comply with those deadlines, the claimant can recover enhanced interest of 18% on the portion of the claim affected, together with attorney's fees. The insured bears the burden to establish its right to these remedies. *Republic Underwriters Ins. Co. v. Mex-Tex, Inc.*, 150 S.W.3d 423, 427 (Tex. 2004). To establish such a right, the claimant must prove that (1) a claim was made under an insurance policy, (2) the insurer is liable for the claim, and (3) the insurer failed to follow one or more sections of the prompt-payment statute with respect to the claim. *See Allstate Ins. Co. v. Bonner*, 51 S.W.3d 289, 291 (Tex. 2001).

Here, the first two elements are undisputed; the question is whether AMJ established that United violated the prompt-payment statute. Because the jury was not asked to make any findings in connection with this ground of recovery, AMJ can recover under the prompt-payment statute only if it conclusively established that it is entitled to do so. *See* TEX. R. CIV. P. 279 ("Upon appeal all independent grounds of recovery or of defense not conclusively established under the evidence and no element of which is submitted or requested are waived."). United contends that AMJ failed to conclusively establish that United violated the prompt-payment statute or the date on which the violation occurred.

The claim-handling deadlines at issue begin with a "notice of claim," defined as "any written notification provided by a claimant to an insurer that reasonably apprises the insurer of the facts relating to the claim." TEX. INS. CODE ANN. § 542.051(4) (West 2009 & Supp. 2013). After the insurer receives the notice of claim, it has a limited time to acknowledge receipt of the claim, begin any investigation, and "request from the claimant all items, statements, and forms that the insurer reasonably believes, at that time, will be required from the claimant." *Id.* § 542.055(a). Because the policy in

evidence identifies United as a surplus-lines insurer,[6] United normally would have had to make its initial request for documents from the claimant within thirty business days after receiving a written notice of claim. *Id.*[7] Here, however, the deadline was extended. Because Hurricane Ike was "a weather-related catastrophe," the claim-handling deadlines of the prompt-payment statute were extended for an additional fifteen days. *Id*. § 542.059(b).[8] Thus, after receiving a written notice of claim, United had thirty business days, plus fifteen calendar days, to make an initial request for "items, statements, and forms" from the claimant. If necessary, it could make additional requests for information during the claim investigation. *Id.* § 542.055(b). Finally, unless another provision applies a different deadline, United would be required to pay for a covered claim within 75 days "after receiving all items, statements, and forms reasonably requested and required." *Id.* § 542.058(a).

The jury was not asked to determine the date on which any of these events occurred, so we must work through the prompt-payment provisions to determine if the record conclusively establishes the date on which United was required to pay the claim. First, there is no evidence that AMJ notified United of the claim in writing. We therefore cannot determine the date by which United was required to make its initial request for material from AMJ. Nevertheless, the record does show that less than a month after the hurricane, United wrote to AMJ that the policy requires, as a condition precedent to coverage for the claim, that AMJ sign a sworn proof-of-loss form. There are two such completed forms in the record. The first is dated March 10, 2009 and

---

[6] This also was supported by United's corporate representative, and there was no controverting evidence.

[7] A "business day" is defined as "a day other than a Saturday, Sunday, or holiday recognized by this state." *Id.* § 542.051(1); *see also* TEX. GOV'T CODE ANN. § 662.003 (West 2012) (identifying national and state holidays).

[8] We take judicial notice that Hurricane Ike was declared to be such an event. *See* Texas Department of Insurance, Commissioner's Bulletin No. B-0066-08 (Sept. 24, 2008), *available at* http://www.tdi.texas.gov/bulletins/2008/cc68.html (last visited June 23, 2014).

20

states that the value of claim, after payment of the deductible, is $1,491,627.48. There is no direct evidence of the date on which United received this executed proof-of-loss form, but circumstantial evidence establishes that it was received by March 16, 2009, because on that date, United issued checks payable jointly to AMJ and Krone for precisely the amount stated in the form. A second sworn proof-of-loss form for payment of a further $222,000.00 was signed on November 18, 2009. Again, there is no direct evidence of the date on which United received it, but evidence that United paid that amount on November 23, 2009 establishes that United received it by that date. Because the date of this payment was the date by which United received "all" reasonably requested and required material, enhanced interest on the unpaid portion of the claim began to accrue 75 days later and continued to accrue until the date of judgment. *See id.* § 542.058(a) (payment is due the specified number of days "after receiving *all* items, statements, and forms reasonably requested and required" (emphasis added)); *Mex-Tex, Inc.*, 150 S.W.3d at 427–28 (enhanced interest began accruing 75 days after the insurer underpaid the insured's claim for a weather-related catastrophe and continued to accrue until the date of judgment).

In arguing that interest began to accrue on March 16, 2009, AMJ asserts that as of that date, there were "no open issues" because United believed it had completed the claim process and Krone did not make the supplemental claim until a later date. This argument fails for two reasons.

First, the evidence does not conclusively establish these assertions as fact. Although United's corporate representative testified that Krone made the supplemental claim after March 16, 2009, Krone testified that he made the supplemental claim before then. AMJ also contends that the supplemental claim was merely Krone's attempt to collect for invoices he had already given United, implying that this claim did not involve new material or a continuing investigation, but here, too, the evidence is

21

conflicting. When asked to tell the jury about the supplemental claim, Sheffield testified that "we had been trying to find a contractor that would come out and take a look at [the elevator shaft]," and "were able to finally get those guys out" to estimate the costs of repair. Even if the claim did involve an invoice for previously-completed work rather than an estimate for a future repair, there is evidence that Krone was not simply resubmitting an invoice that he already had produced to United, but instead was submitting the invoice for the first time. Specifically, the evidence included Krone's email of March 23, 2009 to AMJ's owner in which Krone informed Monty, "I have found [an invoice] for 259K that I have never seen."

Second, even if March 16, 2009 had been established conclusively as the date on which United received the last of the material it requested, then enhanced interest would not start to accrue on that date; it would start to accrue 75 days later. *See* TEX. INS. CODE ANN. §§ 542.058(a), 542.059(b); *Mex-Tex, Inc.*, 150 S.W.3d at 427–28.

In sum, given the evidence in the record and the terms of the prompt-payment statute, United had until February 6, 2010—75 days after November 23, 2009—in which to pay the full amount owed. Because the jury found that United instead left $300,000.00 unpaid, interest of 18% began accruing on that amount on February 6, 2010 and continued to accrue until the date of judgment. *See Mex-Tex, Inc.*, 150 S.W.3d at 427–28. We accordingly sustain this issue in part, and modify the portion of the judgment awarding AMJ enhanced interest, reducing the award from $178,734.00 to $133,153.20, representing 18% interest on $300,000.00 for two years, five months, and nineteen days.

## F. AMJ failed to provide legally sufficient evidence to calculate a reasonable fee.

In its last issue, United contends that the evidence of the reasonable fees for the necessary services of AMJ's attorneys is legally insufficient to meet the standard set

forth in *El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757 (Tex. 2012). In that case, the Texas Supreme Court explained that the "lodestar" method for calculating attorney's fees applies to cases decided under the Texas Commission on Human Rights Act. *Id.* at 760. To arrive at a reasonable amount for attorney's fees using this method, the factfinder "must determine the reasonable hours spent by counsel in the case and a reasonable hourly rate for such work." *Id.* The product of those two numbers is the "lodestar." *Id.* If necessary, a multiplier may be applied to the lodestar to adjust it up or down in order to reach a fee that is reasonable under the circumstances. *Id.* To establish the number of hours reasonably expended, the party seeking the award must provide evidence that is sufficiently specific to allow the factfinder to determine the amount of time spent on a particular task and to decide whether that length of time was reasonable. *Id.* at 763.

AMJ responds that *El Apple* does not apply to cases other than those decided under the Texas Commission on Human Rights Act, but if it does apply, then the evidence here was sufficiently specific to meet that standard. We disagree with both of these assertions.

First, it is true that a plaintiff asserting a claim under the Texas Commission on Human Rights Act is required to use the lodestar method of proving attorney's fees, and that a plaintiff seeking to recover for breach of contract or deceptive practices in an insurance case is not subject to the same requirement. AMJ nevertheless chose to use the lodestar method when seeking attorney's fees for services performed through the end of trial, offering evidence of the hours of work multiplied by the hourly rate of the person who performed the work. *See Long v. Griffin*, No. 11-1021, 2014 WL 1643271, at *2 (Tex. Apr. 25, 2014) (per curiam) ("The affidavit supporting the Griffins' request for attorney's fees used the lodestar method by relating the hours worked for each of the two attorneys multiplied by their hourly rates for a total fee.").[9] Having chosen that

---

[9] Because United addresses only the evidence of attorney's fees through the conclusion of trial,

23

method of proof, AMJ was required to introduce sufficient evidence to allow the factfinder to apply it. *See City of Laredo v. Montano*, 414 S.W.3d 731, 736 (Tex. 2013) (per curiam). Specifically, "a party choosing the lodestar method of proving attorney's fees must provide evidence of the time expended on specific tasks to enable the fact finder to meaningfully review the fee application." *See Long*, 2014 WL 1643271, at *1.

Following these Supreme Court opinions, we must conclude that the evidence is legally insufficient to support the award of trial attorney's fees. Matthew Pearson testified that his firm represented AMJ on a contingent-fee basis, but that if his firm had been hired by the hour, his hourly rate would have been $300.00; associate Shannon Loyd's rate would have been $200.00; and paralegal Alison Balcarcel's hourly rate would have been $100.00. He stated that his firm does not keep billing records, but he tried to "determine how much time we spent on different aspects of the case." Pearson said that he would have billed 94 hours through the end of trial; Loyd would have billed 257.5 hours, and Balcarcel would have billed 196 hours, for a combined total of $99,300.00. Although the jury assessed attorney's fees through trial at precisely that amount, Pearson's testimony about the number of hours of work performed during certain phases of litigation either were not linked to specific tasks or lacked the specificity required for meaningful review.

Pearson divided the litigation into phases that he referred to as discovery, depositions, motions, and trial. Regarding trial, he stated that he spent three 8-hour days helping Loyd prepare for trial, and that Loyd and Balcarcel spent seven 8-hour days preparing for trial. He stated that all three of them spent five 14-hour days attending trial and working before and after court was adjourned. Although he identified no

---

it does not appear to challenge the contingent award of appellate attorney's fees. AMJ's evidence of appellate attorney's fees does not include a prediction of the number of hours of work that would be required or a reasonable billable rate for any person who might perform the work, but instead appears to be based on a flat rate for the work.

specific tasks that any of them performed when preparing for trial and trying the case, jurors witnessed much of that work for themselves and could draw inferences about whether the time expended was reasonable. *See Montano*, 414 S.W.3d at 737.

This record also could have permitted the jury to conclude whether the time expended on depositions was reasonable and necessary. Regarding that aspect of the case, Pearson testified that he looked at the number and length of depositions, and calculated that Loyd spent 68 hours "preparing for and taking the depositions in this case" and Balcarcel spent 10 hours on "a lot of background work, helping us get documents, organizing exhibits that we might use in a deposition." Although Pearson did not identify the number or duration of the depositions, portions of Sheffield's deposition were played for the jury, and over the course of the trial, the jury heard witnesses refer to the depositions of seven other people, each of whom testified at trial. One such witness stated that his own deposition lasted eight or nine hours. The jury arguably could have concluded from such evidence that it was reasonable for an associate to spend 68 hours preparing for and taking the deposition of those eight witnesses, and for a paralegal to spend 10 hours preparing the exhibits used in the depositions.

But similar inferences could not have been drawn about the undifferentiated work performed in the "discovery" and "motions" aspects of the litigation. Pearson described the work of discovery as "sending paperwork to one side [and] receiving paperwork and documents from the other side. So those hours go into sending things out; receiving things; when you get documents, organizing them, summarizing them." He stated that Loyd spent 45 hours on discovery and Balcarcel spent 60 hours on discovery. But as the Texas Supreme Court has stated, "generalities about tasks performed provide insufficient information for the fact finder to meaningfully review whether the tasks and hours were reasonable and necessary under the lodestar method." *Long*, 2014 WL

25

1643271, at *2. Pearson said nothing about the purpose of this "paperwork," and he drew no distinction between the unspecified tasks performed by a paralegal and those performed by an associate. Without such information, the jury had no way to evaluate the reasonableness and necessity of the hours and billing rates that he allocated to this work. Pearson's testimony regarding motions was similarly deficient. He stated that Loyd spent 6 hours "preparing legal motions" and 12.5 hours "for the actual hearings" on the motions. He did not identify the nature or number of motions that were filed, the number or length of the hearings, or when the motions were prepared or argued. The jury was given no information from which it could evaluate the testimony that this work was necessary or that the time expended on it was reasonable. Jurors could not even know whether any of the motions were written or argued during the time that was already allocated to the preparation and trial of the case.

We sustain United's challenge to the trial court's award of $99,300.00 in attorney's fees for work performed through the conclusion of trial, and remand the case to the trial court for relitigation of that issue. *See id.*, 2014 WL 1643271, at *1 (remanding the case to the trial court for redetermination of attorney's fees); *Montano*, 414 S.W.3d at 737 (affirming the portion of the judgment concerning one attorney's fees, reversing the portion concerning a second attorney's fees, and remanding for the trial court to redetermine the amount due for work performed by the second attorney).

## V. CONCLUSION

We affirm the award of $300,000.00 in compensatory damages for United's failure to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim when its liability had become reasonably clear and the award of $600,000.00 based on the jury's finding that United engaged in the deceptive practice knowingly. Because the evidence conclusively establishes that United received the last of the material it reasonably requested and required not later than November 23, 2009 and

26

does not conclusively establish that United received all of the material by any earlier date, we conclude that prompt-payment damages began to accrue 75 days after this date. We accordingly modify the award of enhanced interest to reduce it from $178,734.00 to $133,153.20. Finally, we conclude that AMJ, having elected to prove trial attorney's fees using the lodestar method, failed to introduce evidence that was sufficiently specific to permit the determination of a reasonable fee for its attorney's necessary services. We therefore reverse the award of trial attorney's fees and remand the case with instructions to the trial court to retry that issue, and thereafter, to enter judgment consistent with that finding and with the previous judgment as modified by this court.

/s/     Tracy Christopher
        Justice

Panel consists of Justices Christopher, Donovan, and Brown. (Donovan, J., Dissenting.)