

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-19-00373-CV

_____

GREAT AMERICAN INSURANCE COMPANY OF NEW YORK, Appellant

V.

COMPASS WELL SERVICES, LLC, Appellee

On Appeal from the 67th District Court
Tarrant County, Texas
Trial Court No. 067-280567-15

Before Gabriel, Kerr, and Bassel, JJ.
Memorandum Opinion by Justice Gabriel

**MEMORANDUM OPINION**

In this insurance-coverage dispute, appellant Great American Insurance Company of New York (GAIC) appeals from a jury's verdict that GAIC had knowingly engaged in unfair insurance-settlement practices after GAIC's insured, appellee Compass Well Services, LLC, sought coverage for a direct physical loss to its covered property. GAIC challenges the legal sufficiency of the evidence to support the jury's findings that GAIC was not prejudiced by Compass's destruction of the property before GAIC could inspect it, that Compass's property sustained a direct physical loss, and that GAIC's conduct was knowing. GAIC also argues that the trial court erred by failing to grant GAIC an offset or credit based on the amount Compass realized in its settlement with the company that had caused the property damage.

We conclude that the evidence was legally sufficient to support the challenged jury findings and that GAIC was entitled to a settlement credit against the jury's award of actual damages. Thus, we reverse and remand the actual-damages award in the trial court's judgment for application of the settlement credit, which will also require the trial court to recalculate other specified monetary awards in the judgment, but affirm the remainder.

## I. BACKGROUND

### A. THE POLICY

Fort Worth-based Compass provided hydraulic-fracturing services—fracking—to Texas oil-and-gas operators. Fracking involves mixing water, sand, and chemicals and pumping the fluid at high pressure into a well to facilitate extraction. In May 2013, Compass was fracking three wells for Cinco Resources in Atascosa County; Cinco had hired GE Oil & Gas Pressure Control to operate the wells' fracking manifolds and had hired StrataGen Engineering to ensure safe operations. The fracking on each well involved several pieces of interconnected equipment: Compass's fracking pipe; a GE manifold trailer; pipe and a connector joint that linked GE's manifold and the wellhead, which Compass had leased from FMC Technologies; pumps that were owned by Compass; and Compass's "fluid ends," which were located on the ends of the pumps. The equipment was rated to withstand 15,000 psi and would be considered "fence post"—irretrievably damaged and no longer serviceable—if the pressure exceeded 16,500 pounds per square inch (psi), which is 10% over the equipment's maximum rated pressure. Compass's equipment was approximately seven months old and would have begun to depreciate at eighteen months.

Because of the value of Compass's oil-and-gas equipment (approximately $30 million, including $500,000 of pipe), Compass bought a GAIC high-deductible, all-risk insurance policy that would cover "'loss' to Covered Property from any of the

Covered Causes of Loss."[1]  A covered cause of loss was defined as a "Risk of Direct Physical 'Loss' to Covered Property."  "Loss," in turn, was defined as "accidental loss or damage."  The policy also delineated several "Duties" for Compass to complete "in the event of loss or damage to Covered Property."[2]  For example:

- "Give [GAIC] prompt notice of the loss or damage.  Include a description of the property involved."

- "Take all reasonable steps to protect the Covered Property from further damage . . . .  Also, if feasible, set the damaged property aside and in the best possible order for examination . . . ."

- "As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.  Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis . . . ."

Regarding any leased equipment, Compass was required to "make a reasonable effort to submit claims for damage to [GAIC] prior to returning the equipment to the owner of the equipment and prior to any repairs being made to the equipment."

## B. THE ACCIDENT

At the Cinco site and before each stage of pumping,[3] StrataGen would pressure test the entire system with plain water at approximately 10,000 psi to ensure the correct assembly and the integrity of the equipment.  The in-line transducers, which

---

[1]Compass's annual premium was $151,030.

[2]No party disputes that the property at issue was covered under the policy.

[3]A stage encompasses approximately 300 to 400 hundred feet of drilling.

4

measure and monitor pressure in the equipment approximately once every second, were also checked before each stage to ensure the equipment was operating properly.

On May 13, 2013, at 5:00 p.m., Thomas Papiernik, a StrataGen engineer, arrived at the Cinco site for his overnight shift and first surveyed the Skeeter well[4] to check how the equipment was "rigged up." He saw nothing out of the ordinary; none of the pipe looked fatigued or corroded, and all equipment appeared correctly assembled and configured. At 2:25 a.m. on May 14, the sixth pressure test of the equipment at the Skeeter well was successfully completed. At 3:46 a.m. while Compass was actively fracking the Skeeter well during the seventh stage, GE employee David Salinas mistakenly shut the master valve to the Skeeter well, stopping the flow of liquid through the valve. Salinas heard a loud "pop," and operations at the well were immediately halted. Compass's leased pipe had separated from its connection to the wellhead and was bent. The threading on the connector joint to the leased pipe had been sheared or bent. Compass and GE took multiple photographs of the well site after the accident; some of the pictures showed visible damage to the leased pipe and connector joint and to GE's manifold.

Compass also completed an incident report the day of the accident and noted that the connector joint "blew off the wellhead and hit other surrounding joints" while fracking at "45 bbl/in at 6925psi." The report listed the names of some of the

---

[4]The Skeeter well was one of Cinco's three wells in Atascosa County.

witnesses and described the damage: "FMC fitting on well head was stripped. Iron piping was bent. Compass Frac equipment subjected to excessive pressure in all iron. Fluid ends and pumps may be damaged." Salinas lost his job and was told that by closing the wrong valve, he had caused over $2 million in damages.

Compass believed that the failure of the connector joint resulted from pressure that exceeded the manufacturer's test pressures, which was caused when the valve was shut during Compass's high-pressure fracking. In short, Compass's "initial assessment" was that "[t]here had been a severe overpressure event." At the time of the accident, in-line transducers located at three places in the pipe system showed that the fluid pressure rose to no more than 8,800 psi, which was within the allowable fluid pressures for the equipment. But Papiernik noted the day after the accident that the data from the in-line transducers could not be relied on for causation:

> [The accident] happened so quickly, that the 1 sec[ond] data acquisition record is not representative of the true maximum pressure that was reached inside the treating lines during the failure. One of the pressure transducers on the high pressure pumps recorded a maximum pressure of 15,111 psi, so it must be assumed that the true maximum pressure was at least this high.

Cinco required Compass to immediately "switch all [of the] equipment out," even equipment that was not visibly damaged. Cinco's demand was based on the manufacturer's and seller's recommendations that all pipe and fluid ends needed to be replaced because all of the pipe had been exposed to overpressure (specifically, 20,000 psi) and, therefore, could not be recertified for use. Based on these recommendations

6

and on a concern that the switched-out pipe could accidentally be used at another site, Compass "scrapped it." Compass received approximately $5,000 for the scrap value of its equipment. GE tested its equipment from the Cinco site and determined that it had been overpressurized and damaged; thus, GE discarded it. FMC immediately retrieved its portion of the pipe and the connector joint from the well site and later scrapped both in December 2013 without having it inspected.

Before FMC discarded its affected equipment, Compass hired Becht Engineering in June 2013 to determine if a pressure spike could have resulted in more pressure than was shown by the in-line transducers. Becht concluded, based on its admittedly incomplete analysis,[5] that the maximum pressure at the connector joint had been "below the rated pressure of 15,000" psi. This pressure, however, was "based on slowly applied pressures"; "dynamically applied pressure loads can produce stresses and deformations in a component as much as twice that vs. statically (slowly) applied pressure loads."

### C. THE CLAIM AND THE DENIAL

Compass first sought reimbursement from GE because GE had "caused the damages clearly . . . so why would [Compass] go make a claim with [GAIC] and drive [Compass's] rates up when [Compass] should just be going after GE who made the mistake." After four to five months of attempted negotiations, GE stopped

---

[5]The analysis was incomplete because GE was unresponsive to Becht's request for the specific dimensions of GE's equipment.

communicating with Compass. Compass, therefore, submitted an insurance claim to GAIC on October 16, 2013—five months after the accident. Compass sought coverage for $1,620,737.98 in losses, representing damage to "pump parts, rented [pipe], Compass-owned [pipe], pressure valve, fluid ends, and missile iron." Matthew Beaver, a GAIC adjuster, was assigned the claim.

The day after the claim was filed, Colin Raymond, Compass's CEO, responded to Beaver's initial email and described the accident at the site. When Beaver asked about looking at the pipe, Raymond stated that "it had already been scrapped." Raymond informed Beaver that manufacturer overpressure policies prevented its equipment from being put back into service. At Beaver's request, Compass provided GAIC with Compass's incident report, photographs of the damage, Compass's contract with Cinco, contact information for GE, an inventory with serial numbers for the damaged equipment, and receipts for Compass's incurred costs.[6]

Beaver also hired PT&C|LWG Forensic Consulting Services (LWG) to meet with Compass and to investigate the incident on GAIC's behalf. Although Beaver had frequently hired LWG for engineering investigations involving high-rise elevators, medical-device claims, and lightning-damage claims, this was the first time Beaver had hired it for an oil-and-gas claim. LWG had no experience with investigating fracking

---

[6]Beaver did not remember receiving GE's contact information from Raymond, but Raymond stated that he had provided GAIC with all the responsive information he had.

operations, and Raymond stated that answering LWG's questions was like "frac 101." Similarly, Beaver had never adjusted an oil-and-gas-operations or fracking claim before Compass's claim.

Initially, LWG believed that when Salinas closed the well valve, Compass's "frac pumps and iron pipe were exposed to excessive pressure for 30 or maybe 45 seconds until the joint blew off." LWG told Beaver that "talk[ing] with GE" was necessary "to get additional perspective" on the cause of the loss. Beaver reported to his supervisors that LWG was "in the process of securing additional information from the insured and GE to prepare a timeline of events outlining [how] the loss occurred and how the damage[] was sustained."

By January 2014, LWG informed Beaver that the amount of pressure the pipe and fluid ends were exposed to should be determined because that was "a key component of our investigation." Beaver sent Raymond an "update" letter on January 29, 2014, and requested "clarification" and additional information. Compass provided GAIC with the "overpressure policies" from the equipment manufacturer, which reflected that if the pipe were exposed to pressures of 16,500 psi or greater, the pipe could not be recertified for further use and should be destroyed. In a March 6, 2014 memo between two of LWG's investigating engineers, one engineer indicated that his preliminary conclusion that there was no excessive pressure would be received favorably:

I've gone back and tried to create a simple narrative of events and opinion of what the maximum pressures might have been. I think you may like the conclusion. It's not as simple as you might like but it's one I think I can support from an engineering standpoint. Of course this has been done [on] the fly and I'd have to recheck myself in a final document.

On April 4, 2014, LWG concluded in a formal report that because the "highest pressures most likely experienced by the system" were 16,400 psi at the pumps and 14,600 psi at the wellhead, "no damage due to overpressure of the system likely occurred that LWG could predict without actually examining the equipment and piping. The separation of the 3″ [pipe] at the frac head was due to some other factor than the alleged overpressure." This conclusion was partially based on (1) the assumption that the well-isolation valve at the wellhead "closes in approximately 10 to 20 seconds" and "does not close instantaneously (fractions of a second)" and (2) the American Society of Mechanical Engineers' (ASME) standards, which permit the examination of equipment if overpressurized to determine suitability for future use and require pipe to be able to withstand at least 125% of its designed pressure. LWG posited that other "failure mechanisms" caused the failure: "failed internal seal, improper assembly, or material deficiencies." LWG also concluded that "there was no overpressure event that would have provided a reasonable basis for discarding the equipment without an engineering review of the equipment." At no point during the investigation did LWG or Beaver ask for statements from anyone who had been at

10

the site at the time of the accident or attempt to get information about GE's or FMC's equipment that had been in use at the Skeeter well.

In May 2014, GAIC reimbursed Compass for the rented pipe and connector joint, which were two pieces of equipment that some of the photos showed had been physically damaged, resulting in a payment to Compass of $558.34 after subtracting Compass's deductible. GAIC denied the remainder of Compass's claim because Compass had produced no evidence of physical damage to the rest of its equipment, had given late notice of the claim, and had disposed of the damaged property, all allegedly contrary to the terms of the policy. Raymond stated that the denial was "frustrating": "[T]o wait seven or seven and a half months and get denied and [relying on LWG's] report, that's . . . full of mistakes written by guys who didn't know anything about fracking, you know, just frustrating."

## D. THE RECONSIDERATION REQUEST

Compass filed an investigatory petition against GE to "get more information from GE to get [GAIC] to reconsider [Compass's] claim." *See* Tex. R. Civ. P. 202.1(b), 202.2. During discovery, GE produced a root cause analysis (RCA) that it had conducted shortly after the accident at Cinco's request to determine the causes for the equipment failure, to inform future improvements, and to determine the required pressure to "fail" the connector joint's threads. To prepare the RCA, GE had collected relevant documents, looked at the pictures, met with employees involved in the accident, and contacted third parties with relevant information. GE

11

found, based on "engineering calculated pressure," that to cause the connector joint to fail as it had, the pressure had been in a range of between 19,212 to 36,938 psi. GE also gave Compass employee statements about the accident. Compass then gathered records from Cinco, StrataGen, and FMC. During Compass's records gathering, FMC told Raymond that although its engineers could not determine the exact pressure that the FMC equipment had experienced during the accident, the engineers "collectively agreed that the pressure was well in excess of 22,000 p.s.i."

Compass forwarded all of this information to GAIC in March 2015, and GAIC forwarded some of it to LWG for review.[7] LWG's review "generated some additional questions," spurring LWG to request "documentation that supports [GAIC's] answers to the . . . questions, as well as the assumptions made in the previous GE report [i.e., the RCA]." Specifically, LWG requested the "[d]esign specification" for the connection valve, the engineering design for the configuration of the equipment at the site, and any microscopic analyses of the failed equipment. Compass responded to LWG's questions but noted that most of the information LWG asked for could only be obtained from GE. Compass "reiterate[d] its demand for coverage." GAIC did not respond to Compass about the effect of this further information on its prior coverage decision, and LWG did not issue a revised report based on the information.

---

[7]GAIC forwarded GE's pictures taken after the accident, invoices and a spreadsheet for GE's replacement equipment, "[m]issle presentation – an explanation of iron," and a spreadsheet of "data collected during incident."

12

Compass requested GAIC's claim file to "get a better understanding" of the reasons for GAIC's denial, but GAIC refused.

## E. THE LAWSUITS

On August 25, 2015, Compass sued GAIC, raising claims for breach of the policy, statutory bad-faith insurance-settlement practices, common-law breach of the duty of good faith and fair dealing, and failure to promptly pay Compass's claim. GAIC answered and asserted as an affirmative defense that Compass's failure to comply with its duties under the policy and destruction of the property prejudiced GAIC and prevented it from determining whether Compass's covered property had suffered a direct physical loss.

Compass filed a separate negligence suit against GE in January 2016. In May 2017, Compass settled with GE for approximately 15% of the amount Compass had sought in coverage from GAIC. GAIC did not consent to the settlement.

Regarding Compass's suit against GAIC, Compass designated three expert witnesses for trial:

- Charles R. Stone was designated as an engineering expert regarding "pressurized operations and well control issues, blowout prevention, and downhole operations." Stone opined that because the connector joint's manufacturer tested the joint at pressures exceeding 22,000 psi, the fluid pressure at the Cinco wellsite must have exceeded 22,000 psi—more than 10% higher than the 15,000 psi rating for the connector joint.

- Dean Love, a vice president for an iron-recertification company and a former FMC inspector, was designated to opine regarding recertification standards for oil-and-gas equipment. He stated that when equipment experiences fluid pressure that is more than 10% over its pressure rating, it cannot be used and

13

must be destroyed. The circumstances of the accident convinced Love that "pumping against a closed valve" caused the pressure to quickly rise above the pressure rating.

- Tony Biello was designated as an expert in insurance-industry standards and practices. Compass informed GAIC that Biello would opine that "GAIC failed to adjust Compass'[s] insurance claim in a good faith manner," partially based on Beaver's deposition responses. According to Biello, GAIC was not limited to testing the pipe to determine damage and had a duty to pursue other available avenues of investigation to determine coverage. Biello also opined that the policy afforded coverage for Compass's insurance claim and that GAIC had violated the Texas Insurance Code.

GAIC filed a pretrial motion to strike or limit Stone's, Love's, and Biello's expert testimony.[8] *See* Tex. R. Evid. 702. GAIC asserted that Stone's opinion was unreliable because he had conducted no independent testing and had merely assumed several key facts, causing an impermissible analytical gap between the facts and Stone's opinion. GAIC raised the same objection to Love's proffered opinion based on Love's reliance on "cherry picked information provided to him by Colin Raymond and the attorneys for Compass" and on Love's failure to perform any calculations or independent assessment of the accident or the "property." According to GAIC, Biello's opinion regarding GAIC's claim-handling conduct was "nothing more than subjective differences of opinion concerning how Biello might have adjusted the claim rather than Beaver"; thus, Biello's opinion was unreliable, "unfounded, subjective, and

---

[8]All three had been deposed at the time GAIC filed its motion.

14

[is] nothing more than advocacy for [Compass]." The trial court denied GAIC's motion, and all three testified at trial.[9]

## F. THE TRIAL AND THE APPEAL

When asked at trial why he continued to pursue Compass's claims against GAIC years after the accident, Raymond testified it was an issue of fairness:

[F]undamentally, I just don't think [GAIC] treated [Compass] fairly. . . .

. . . [Compass] tried to go after the responsible party [i.e., GE]. It didn't work. [Compass] got a whole bunch of new information. [Compass] worked with [GAIC's] consultant [i.e., LWG] who didn't really understand [the fracking] business to try and teach them the business. . . . [Compass] sued GE at great expense to get more information which [GAIC] then ignored. . . . I just don't think [GAIC] treated [Compass] fairly at all.

After a six-day trial, ten of twelve jurors found in favor of Compass, specifically finding that

1. GAIC and Compass had failed to comply with the terms of the policy;

2. GAIC was not prejudiced by Compass's failure to comply;

3. GAIC had engaged in unfair settlement practices by knowingly

   a. refusing to pay Compass's claim without conducting a reasonable investigation,

   b. failing to determine coverage within a reasonable time, and

---

[9]Stone testified by video deposition. *See generally Gunn v. McCoy*, 554 S.W.3d 645, 667 (Tex. 2018) ("Our rules make deposition testimony admissible without regard to the party's availability to appear live.").

15

c. failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of Compass's claim after GAIC's liability had become reasonably clear;

4. GAIC had failed to make prompt payment within fifteen business days after November 7, 2013,[10] which was the date GAIC had received "all items, statements, and forms it reasonably requested from Compass that were necessary to decide" coverage; and

5. Compass had not made an election of remedies to recover its damages from GE.

GAIC filed a motion for judgment non obstante veredicto (JNOV), arguing that there was no evidence the property had been physically damaged because it was scrapped after the accident, that GAIC had conclusively established that it had been prejudiced by Compass's material breach of the policy's terms, and that the evidence did not support any violation of the Insurance Code. *See* Tex. R. Civ. P. 301. The trial court denied GAIC's motion. Accordingly, the trial court entered judgment on the jury's verdict, awarding Compass its actual damages; additional statutory damages for GAIC's knowing violations of the Insurance Code; attorney's fees; interest; and court costs.

GAIC then moved for a new trial or, alternatively, to modify or correct the judgment. *See* Tex. R. Civ. P. 320, 324, 329b. GAIC argued that the evidence was factually insufficient to support the jury's findings, entitling GAIC to a new trial. Alternatively, GAIC requested a judgment modification to grant an offset against the

_____

[10]This was approximately one month after Compass had filed its claim with GAIC.

16

actual-damages award based on the amounts Compass received from GE in their settlement. The motion was overruled by operation of law. *See* Tex. R. Civ. P. 329b(c).

Now on appeal, GAIC argues that it conclusively established that it was prejudiced by Compass's material breach of the policy's terms and that no evidence showed the equipment suffered a direct physical loss. GAIC also attacks the legal sufficiency of the evidence to support the jury's finding that GAIC knowingly violated the Insurance Code, rendering the additional damages award improper. Finally, and in the alternative to its sufficiency arguments, GAIC contends that it was entitled to an offset for the settlement amount Compass received from GE.

## II. LEGAL SUFFICIENCY OF THE EVIDENCE

Even though GAIC argued in its motion for new trial that the evidence was factually insufficient to support the jury's verdict, GAIC has returned to the arguments it urged in its JNOV motion and now focuses solely on the legal sufficiency of the evidence to support some of the jury's answers. *See Damian v. Bell Helicopter Textron, Inc.*, 352 S.W.3d 124, 141 (Tex. App.—Fort Worth 2011, pet. denied) (stating no-evidence and matter-of-law issues may be preserved by raising those complaints in a JNOV motion).

### A. PREJUDICE TO GAIC

GAIC argues that it conclusively established it was prejudiced by Compass's breaches of the policy—destroying its equipment before GAIC could inspect it and

17

waiting five months after the accident to report the loss to GAIC—rendering the jury's contrary answer unsupported.

## 1. Prejudice is a Factual Inquiry

GAIC and Compass have engaged in a protracted back-and-forth in their briefing about whether prejudice to an insurer is presumed as a matter of law when the insured destroys its allegedly damaged property before the insurer can inspect or test it. We see no need to reiterate their arguments or engage in a case-by-case analysis as do the parties. The case law is clear that, no matter the type of breach alleged, an insurer must establish some form of actual prejudice in order to disclaim coverage on the basis of that prejudice. *See Lennar Corp. v. Markel Am. Ins. Co.*, 413 S.W.3d 750, 755–56 (Tex. 2013); *Hernandez v. Gulf Grp. Lloyds*, 875 S.W.2d 691, 692 (Tex. 1994); *Coastal Refin. & Mktg., Inc. v. U.S. Fid. & Guar. Co.*, 218 S.W.3d 279, 288–90 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (op. on reh'g); *accord Trumble Steel Erectors, Inc. v. Moss*, 304 F. App'x 236, 244 (5th Cir. 2008) (per curiam) ("Evidence of an inability to investigate when and in the manner that an insurer would have liked . . . does not in itself constitute material prejudice.").

In short, the fact of a breach by the insured does not establish prejudice to the insurer as a matter of law.[11] There must be sufficient evidence that the insured's breach was material. *See PAJ, Inc. v. Hanover Ins. Co.*, 243 S.W.3d 630, 631 (Tex. 2008).

---

[11]We agree with Compass that to hold otherwise "would mean that *every* contractual breach is material."

That is, "an immaterial breach does not deprive the insurer of the benefit of the bargain and thus cannot relieve the insurer of the contractual coverage obligation." *Id.* Prejudice is not presumed. *Coastal Refin.*, 218 S.W.3d at 288–89; *see also Am. Nat'l Cnty. Mut. Ins. Co. v. Medina*, No. 05-16-01062-CV, 2018 WL 4037357, at \*3–4 (Tex. App.—Dallas Aug. 22, 2018, no pet.) (mem. op.).

### 2. Sufficient Evidence Supports No-Prejudice Finding

Accordingly, the operative question, and the one that GAIC must have conclusively established, is the materiality of Compass's breaches of the policy. *See Greene v. Farmers Ins. Exch.*, 446 S.W.3d 761, 767 (Tex. 2014). Materiality of an insured's breach is based on "several factors, including the extent to which the breach deprived the insurer of the benefit that it reasonably could have anticipated from full performance by the insured." *Id.* at 768. "If the insurer receives its reasonably anticipated benefit despite the insured's breach, the breach is immaterial, the insurer is not prejudiced, and the insurer is not excused from performance." *Id.*

Because actual prejudice to GAIC based on Compass's material breaches of the policy is an affirmative defense, GAIC carried the burden to prove it. *See State Farm Lloyds v. Fuentes*, 597 S.W.3d 925, 933 (Tex. App.—Houston [14th Dist.] 2020, no pet.). When a party attacks the legal sufficiency of an adverse finding regarding an issue on which the party had the burden of proof, the party must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (per curiam); *Sterner v.*

19

*Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989). To determine if GAIC proved prejudice as a matter of law, we must first examine the record for evidence that supports the jury's finding, while ignoring all evidence to the contrary. *See Dow Chem.*, 46 S.W.3d at 241. If no, or no more than a scintilla of, evidence supports the finding, then we examine the entire record to determine if the contrary position is conclusively established—proven as a matter of law. *Id.*; *see also Int'l Bus. Mach. Corp. v. Lufkin Indus., LLC*, 573 S.W.3d 224, 235 (Tex. 2019).

GAIC argues that Compass's failure to timely notify GAIC of the loss and destruction of the covered property before filing a claim were material because GAIC was unable to inspect and test the property, making its investigation more complicated. Indeed, LWG informed GAIC that it could not definitively determine whether the equipment had been overpressurized "without actually examining the equipment and piping." LWG also stated there was no reasonable basis to discard the property. But Compass's insurance expert, Biello, testified that GAIC had other means to investigate whether the damage was a covered loss; thus, GAIC should have pursued other avenues of investigation other than testing the equipment at the wellsite. Juan Herrera, GAIC's engineering expert, testified that a qualified engineer would have been able to calculate the pressures present at the well site based on the available data even without inspecting the equipment.

Beaver testified that the right to inspect is GAIC's most valuable right under the policy, but he agreed that inspection is not the sole way to investigate a claim.

20

Indeed, even after Raymond told Beaver that he believed all involved equipment had been destroyed, Beaver hired LWG to investigate. In short, Beaver recognized there was more than one way to skin that cat. And those ways were available to GAIC even five months after the accident. *Cf. W & T Offshore, Inc. v. Fredieu*, No. 18-1134, 2020 WL 3240869, at *11 (Tex. June 5, 2020) ("We agree with W & T that evidence of actual earnings at the time of trial is the *best* evidence of future earning capacity, but it is not the *only* evidence in an inquiry that looks . . . into a person's future."). Even so, neither Beaver nor LWG contacted any eyewitnesses to the accident, GE, StrataGen, or FMC. Specifically, their failure to contact GE for information prevented discovery of the RCA and their failure to contact FMC for information prevented the discovery that FMC had not, in fact, destroyed its equipment until December 2013—two months after Compass filed its claim for coverage—contrary to Raymond's prior assertion. Finally, testimony showed that most investigatory testing that could have been done on Compass's equipment to determine if it had been overpressurized was not feasible because the testing itself would have physically destroyed it. In other words, the cure would have been worse than the disease.

We conclude that more than a scintilla of evidence supported the jury's finding that GAIC was not prejudiced by Compass's destruction of its equipment or late notice. *Cf. Weiser-Brown Operating Co. v. St. Paul Surplus Lines Ins. Co.*, 801 F.3d 512, 524 (5th Cir. 2015) (holding insurer cannot avoid liability under Texas's Prompt Payment of Claims Act "by pointing after-the-fact to missing information, the absence of

21

which did not affect the insurer's decision).  In other words, legally sufficient evidence supported a finding that Compass's breaches were not material.  *See, e.g.*, *Trumble Steel*, 304 F. App'x at 244; *Ryan Law Firm, LLP v. N.Y. Marine & Gen. Ins. Co.*, No. 1:19-CV-629-RP, 2020 WL 4043754, at *8 (W.D. Tex. July 16, 2020) (report and recommendation), *adopted*, 2020 WL 6379231 (W.D. Tex. Sept. 9, 2020) (order); *Fuentes*, 597 S.W.3d at 936–38; *cf. Foreman v. Acceptance Indem. Co.*, 730 F. App'x 191, 196–97 (5th Cir. 2018) (per curiam) (concluding evidence that insured failed to provide requested information was sufficient to support jury's verdict that insurer was prejudiced by failure and, thus, was not required to perform under the policy).  Of course, GAIC disputed much of this evidence; but the evidence, viewed in the light most favorable to the jury's no-prejudice finding and in favor of all reasonable inferences to be drawn from the evidence, enabled this jury to reasonably find that GAIC was not prejudiced by Compass's breaches of the policy.  *See City of Keller v. Wilson*, 168 S.W.3d 802, 819–20, 827 (Tex. 2005); *Dow Chem.*, 46 S.W.3d at 241.  We overrule GAIC's first issue.

## B.  DIRECT PHYSICAL LOSS

GAIC contends in its second issue that Stone's expert testimony regarding physical loss to Compass's equipment was unreliable and inadmissible; thus, the evidence is legally insufficient to support the jury's finding that Compass's equipment suffered a direct physical loss.  In other words, GAIC contends that because the fact-finder was barred by the rules of law or of evidence from giving weight to Stone's

opinion that Compass's equipment was physically damaged by overpressure and because no other evidence (or only a scintilla of evidence) establishes this vital fact, the evidence is legally insufficient to support the jury's finding that GAIC failed to comply with the policy by refusing to pay for Compass's direct physical loss to its covered property. *See Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 480 (Tex. 2017); *Wilson*, 168 S.W.3d at 813. For the following reasons, we overrule GAIC's second issue.

### 1. Admissibility of Stone's Expert Opinion

Our first question is whether Stone's testimony was reliable and, thus, could be credited by a reasonable jury in finding that Compass's equipment suffered a direct physical loss under the policy. We review the admission of expert testimony for an abuse of the trial court's discretion. *See Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 347–48 (Tex. 2015). And because GAIC raises the issue in the context of its legal-insufficiency argument, we consider the entire record, including contrary evidence tending to show that the expert opinion is unreliable, to "independently consider whether the evidence at trial would enable reasonable and fair-minded jurors to reach the verdict." *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 638 (Tex. 2009).

GAIC asserts that Compass's physical-loss theory "hinges on its ability to prove that the [connector joint] failed due to overpressure." To establish the fallacy of this theory, GAIC launches a three-pronged attack on the reliability of Stone's

23

opinion, arguing that he (1) failed to exclude other possible causes for the damage to the connector joint, (2) indulged material factual assumptions that were unsupported by other evidence, and (3) failed to conduct testing on the damaged equipment to support his physical-damage theory.

"An expert witness may testify regarding 'scientific, technical, or other specialized' matters if the expert is qualified[12] and if the expert's opinion is relevant and based on a reliable foundation." *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 578 (Tex. 2006) (quoting Tex. R. Evid. 702). Reliability is a "flexible inquiry" that may consider such factors as the extent to which the expert's theory has been or can be tested, the extent the technique relies upon the subjective interpretation of the expert, whether the theory has been peer reviewed or published, the technique's potential rate of error, whether the theory has been generally accepted as valid by the relevant community, and the nonjudicial uses that have been made of the theory. *Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 801 (Tex. 2006); *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 557 (Tex. 1995). Reliability also must take into account the expert's experience, knowledge, and training. *Transcont'l Ins. Co. v. Crump*, 330 S.W.3d 211, 216–17 (Tex. 2010).

---

[12]GAIC does not attack Stone's qualifications. *See* Tex. R. Evid. 702.

24

### a. Exclusion of other possible causes

GAIC relies on its theory that the pipe bent at a pressure lower than the maximum rated pressure after the pipe rocked within the threading of the connector joint and separated. It argues that Stone's failure to exclude this plausible, alternate cause of the failure of the connector joint mandates exclusion of his expert opinion. Indeed, the failure to rule out alternative, plausible causes of an incident with reasonable certainty can render an expert's opinion unreliable. *Id.* at 218; *see also Bustamante v. Ponte*, 529 S.W.3d 447, 456 (Tex. 2017); *TXI Transp. Co. v. Hughes*, 306 S.W.3d 230, 237 (Tex. 2010).

Herrera, GAIC's expert, testified that the connection between the connector joint and the leased pipe failed because of a combination of (1) a pressure spike to less than 11,500 psi, caused by a "water hammer,"[13] and (2) pipe movement, both of

---

[13]Herrera explained that a water hammer is an "elastic wave" caused when water in a pipe is suddenly stopped:

> Water hammer is a phenomenon with the flow of fluid. For any reason you have a column, a long stretch of fluid that is moving and you stop that movement very quickly, you basically come and stop it. All of that fluid that's coming behind is going to push against the valve and in the process of doing that, two things happen[].
>
> One, you have pressure increase and you . . . can get what's called water hammer to the maximum pressure. You . . . can have just a pressure surge which is just an increase of pressure, but not as high as water hammer.
>
> And you have the second effect that is because of that . . . water being stopped very quickly, you set up what is referred to in mechanics

which resulted in a bending of the leased pipe and damage to the threads of the connector joint. Because the leased pipe was not secured with pipe restraints at the time of the accident, Herrera opined that the pipe rocked and bent, causing the connection between the pipe and the connector joint to weaken and the joint to fail. Herrera based his opinion on pictures of the failed connector joint, which he stated showed the "threads on the side were shooting one direction" and the "threads on the other side were shooting in the opposite direction."

Stone relied, in part, on GE's RCA in reaching his conclusion that the connector-joint failure and bent pipe had been caused by an ultrahigh-pressure event[14] that the pressure-relief valve was incapable of relieving. He double-checked GE's calculations regarding the pressure surge caused by Salinas's closing the wrong valve and determined that the calculations were correct. These calculations showed that the equipment was subjected to an estimated pressure "in excess of 25,000 psi." In reaching its conclusion in the RCA, Stone testified that GE had considered the

as an elastic wave. Basically the elastic wave is like sound. . . . That elastic wave goes back and it comes back again and that's what causes the rattling in the pipe. That's what causes the movement in the pipe.

So we have two things happening. An increase in pressure right at the valve and that vibration in the water column that rattles the pipe . . . .

[14]Stone defined ultrahigh pressure as any pressure over 10,000 psi.

possibility of a water-hammer effect. And GE had measured the sheared threads in the connector joint in attempting to determine the pressure at the moment of failure.

Stone discarded the possibility that improper installation caused the failure "because the equipment was pressure tested successfully in the field." Stone recognized "other potential failure modes" that could explain the failure, but the "pressure test [done before each stage] is the tell-all to an engineer." In other words, "[i]f it's a successful pressure test, we're good to go. It tells you that you don't have a counterfeit. You don't have mismatched union hanging out. You've got enough threads engaged to actually pass the pressure test." Stone, as did GE, deduced that the connector joint would not have failed as it had at the Skeeter well unless the pressure had been in excess of 22,500 psi. Stone also relied on his experience with these types of connector joints—thirty to forty scientific articles regarding high-pressure drilling and dozens of testing specifications for setups like the one used at the Skeeter well—in concluding that the connector joint failed because of an ultrahigh pressure spike that could not be relieved by the pressure-relief valve and that could not be explained by water hammer or improper installation.

Stone did not myopically view the accident through the lens of his chosen theory. Rather, he determined which cause of the failure was most probable based on conditions at the time of the accident and refuted other plausible causes of the failure, some of which had been posited by LWG. *Cf. Brown v. Parker–Hannifin Corp.*, 919 F.2d 308, 312 (5th Cir. 1990) (holding expert testimony inadmissible because

27

expert did not determine the most probable cause of oil-field equipment malfunction when other theories explained malfunction). He recalculated GE's RCA computations, which had considered the water-hammer possibility along with the properties of the failed connector joint, and explained why improper installation was an invalid causation theory under the presented facts. Indeed, even Herrera recognized that any water hammer that would cause movement in the pipes would be accompanied by a "pressure surge."[15] GAIC argues that Stone failed to rule out Herrera's opinion regarding bending, but Herrera admitted that he had done no calculations regarding bending and that his opinion was based on a hypothetical water hammer that caused the pipe to rock and the connector joint to fail. Stone was not required to disprove or discredit "every possible cause other than the one espoused by him" for his opinion to be considered reliable. *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987).

At the end of the day, the information Stone considered and his experience with high-pressure drilling, including experience with the exact connector joint used at the Skeeter well, led him to conclude that the joint failed because of an extreme pressure spike, caused by closing the master valve, that exceeded the manufacturer's maximum pressure rating by more than 10%. *See generally* Tex. R. Evid. 703. Stone

---

[15]Herrera's calculations, as opposed to Stone's, led Herrera to conclude that the water hammer caused the pressure to increase by 1,314 psi when the master valve was closed, resulting in a maximum pressure of 11,000 psi.

sufficiently excluded alternative, plausible causation theories, including those identified by LWG, with reasonable certainty based on the presented facts. *See Hughes*, 306 S.W.3d at 237; *accord N.Y. Cent. Mut. Fire Ins. Co. v. Electrolux Home Prods., Inc.*, No. 18-CV-294-FPG, 2020 WL 1151460, at *4 (W.D.N.Y. Mar. 9, 2020) (order); *Cone v. Hankook Tire Co.*, No. 14-1122, 2017 WL 238448, at *6 (W.D. Tenn. Jan. 19, 2017) (order); *McKinney v. Mac Acquisition, LLC*, No. 13-4991, 2014 WL 12719100, at *5 (E.D. La. Apr. 15, 2015) (order); *cf. Cerny v. Marathon Oil Corp.*, 480 S.W.3d 612, 621–22 (Tex. App.—San Antonio 2015, pet. denied) (holding, in toxic-tort case, expert testimony not probative because it failed to exclude alternative sources for injury-causing chemicals, including emissions by other oil-and-gas operations in the vicinity of plaintiff's home). And, like Stone, Love—Compass's recertification-standards expert—was able to rule out alternative causes of the equipment failure.

The differences between Herrera's and Stone's conclusions, which were based on some of the same facts, illustrate a typical expert battle, which is not a reliability problem. *See Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 40–41 (Tex. 2007); *accord Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 808 (3d Cir. 1997); *Ted v. S. Union Co.*, No. 13-00768-CV-W-HFS, 2015 WL 11120892, at *4 (W.D. Mo. Feb. 11, 2015) (mem. & order). Stone considered and rejected alternative, plausible reasons for the equipment failure; any failure to specifically address one of GAIC's multiple alternative theories is a weight-and-credibility issue, not an admissibility one. *See*

29

*Coastal Tankships, U.S.A., Inc. v. Anderson*, 87 S.W.3d 591, 605 n.25 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) (en banc).

### b. Assumptions were supported by other evidence

GAIC asserts that Stone's opinion was unreliable because his assumptions were unsupported by other evidence. *See generally Wilson*, 168 S.W.3d at 813 ("[I]f an expert's opinion is based on certain assumptions about the facts, we cannot disregard evidence showing those assumptions were unfounded."). First, GAIC argues that Stone's pressure estimate was based on the assumed premise that the connector joint would not fail at pressures below 22,500 psi because that was the manufacturer's failure pressure. According to GAIC, Stone's assumption could not be indulged "without first proving a fundamental assumption that Compass never proved—that the [connector joint] was straight and had not bent." This argument is a variation of GAIC's assertion that Stone failed to rule out that a water hammer caused the pipe to rock and bend, which we have rejected.

Even so, there was other evidence supporting Stone's assumption that the connector joint would not have failed unless the pressure had exceeded the maximum failure pressure. The connector joint was rated to work at 15,000 psi and could have been recertified for use as long as the pressure had not exceeded 16,500 psi. The rigging was visually examined before the accident, and the equipment had passed multiple pressure tests that day at 10,000 psi, which was approximately the psi level Herrera stated was the estimated level at the time of the accident. Further, Love

testified that based on the physical state of the connector joint's threads after the accident and on Stone's and GE's calculations, he also determined that the cause of the failure was overpressure.

Second, GAIC contends that Stone impermissibly assumed all the equipment would have experienced the same pressure as did the connector joint. GAIC relies on the following exchange between Love and Compass's counsel to support its point:

> Q. And as far as the different types of nondestructive testing that's available, and I understand it's your opinion that it wouldn't show damage.
>
> But just so we're clear, what types of nondestructive testing are available?
>
> A. Visual, magnetic particle inspection, ultrasonic wall thickness, phased array, those are the main ones.
>
> Q. And . . . I guess if you had results from one or all of those, that said it was not overpressured, could you conclude it's not overpressured?
>
> A. No.
>
> Q. Why is that?
>
> A. Because it's not 100 percent. . . . .
>
> Q. And does that go to Mr. Stone's testimony, that internal metallurgical change . . .?
>
> A. Yes.
>
> Q. Can you tell me a little bit more about that based on your experience?

A. [Overpressure] expands, it changes the metal makeup. No different than . . . when it's cold. The expansion of the overpressure changes the metallurgy of the part, and you would have to destroy each piece to get that.

Q. And so that's the destructive testing you're talking about?

A. Yeah. . . . You can't just look at [one] piece and say these two are okay. I mean, each piece would have to be destroyed.

GAIC argues that this testimony shows that Love disagreed with Stone and instead opined that "evidence demonstrating whether one piece of equipment experienced overpressure would not support the same conclusion for other equipment." To the contrary, Love's testimony established that if one piece had been overpressurized, the other pieces would have to be destroyed as well. Indeed, Love had testified earlier that testing portions of the equipment would be fruitless because "just like . . . plumbing in your house, it's all tied together." In short, Love stated that even if some portions of the pipe passed a recertification test, all portions would have to be destroyed. Cinco required Compass to replace all of its equipment before resuming operations, the manufacturer would not have inspected or recertified any equipment suspected to have been subjected to overpressure, and all contractors at the Skeeter well destroyed their equipment after the accident. Stone's assumption that all the equipment would have been affected by the accident was not unsupported as asserted by GAIC.

### c. Sufficient testing supported Stone's opinion

Finally, GAIC contends that Stone's opinion is unreliable because he did not "conduct or cite tests to support some of the critical aspects of his theory," rendering the opinion no more than his *ipse dixit*. Essentially, GAIC argues that Stone's opinion was inadmissible because he did not physically inspect or conduct any tests on the equipment at the Skeeter well. *See, e.g.*, *Cooper Tire*, 204 S.W.3d at 805. Certainly, Stone did not test the failed equipment; no one did because all equipment was immediately replaced at Cinco's demand and was then destroyed based on an apparent overpressure event and on the manufacturer's representation that it would not inspect the equipment for recertification. In short, the equipment was viewed as "fence post" after the accident. Stone calculated the possibility of damage based on the available data just as GE, LWG, Herrera, and Love did. *See* Tex. R. Evid. 703. The absence of actual, physical testing here is not a basis to render Stone's opinion incompetent while also crediting Herrera's and LWG's as GAIC seems to argue.

### 2. Sufficiency of the Evidence to Establish Direct Physical Loss

GAIC next contends that even if Stone's opinion was competent to establish that the pressure on the equipment exceeded industry standards, Compass failed to proffer more than a scintilla of evidence that its equipment suffered a direct physical loss. GAIC asserts that there is no evidence that there was tangible, material damage to Compass's equipment, which is required for coverage under the policy. Because we have rejected GAIC's competency objections to Stone's opinion, we may consider

33

it in our review of the legal sufficiency of the evidence. *Cf. Wilson*, 168 S.W.3d at 813 (holding if expert opinion is incompetent, it may not be considered in a review of the legal sufficiency of the evidence).

The jury found that GAIC failed to comply with the terms of the policy. Specifically, the jury determined that GAIC failed to pay for direct physical loss to Compass's covered property. Loss was defined in the jury charge as it was in the policy—"accidental loss or damage." Although GAIC now asserts that Compass "alleged no accidental loss," limiting GAIC's liability to accidental damage, GAIC did not object to the definition of loss in the jury charge and followed this definition in its closing jury argument.[16] Thus, we measure the sufficiency of the evidence to show a direct physical loss to Compass's covered property against the unobjected-to definition of loss in the charge. *See Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000) (op. on reh'g); *see also Seger v. Yorkshire Ins. Co.*, 503 S.W.3d 388, 407 (Tex. 2016).

The gravamen of GAIC's sufficiency argument seems to be that there was no evidence of tangible damage to Compass's property, which GAIC asserts means more than economic damage or a future risk of damage. GAIC relies on caselaw requiring "tangible, manifest harm" to covered property to be considered a compensable loss. *U.S. Metals, Inc. v. Liberty Mut. Grp.*, 490 S.W.3d 20, 27 (Tex. 2015). But *U.S. Metals* involved a claim for loss after faulty flanges were installed in the insured's refinery

---

[16]Further, Compass pled that the accident caused "the Loss" of its equipment.

34

processing units. *Id.* at 21, 24. The Texas Supreme Court held that mere installation of the flanges was not a covered loss because no physical damage resulted from the installation. *Id.* at 27. Here, however, Compass alleged that physical loss actually occurred, not just that a condition allowing possible future damage existed. *See id.* ("[A] defective product that causes damage is not an occurrence until the damage actually happens."). Because of these factual differences, GAIC's caselaw is certainly instructive but not conclusive to our inquiry.

Direct physical loss, which in this case includes accidental loss or damage, has been held to occur if the property is in an initial satisfactory state that is changed by an external event into an unsatisfactory state. *N. Am. Shipbldg., Inc. v. S. Marine & Aviation Underwriting, Inc.*, 930 S.W.2d 829, 833–34 (Tex. App.—Houston [1st Dist.] 1996, no pet.) (quoting *Trinity Indus., Inc. v. Ins. Co. of N. Am.*, 916 F.2d 267, 270–71 (5th Cir. 1990)); *accord Wakefern Food Corp. v. Liberty Mut. Fire Ins. Co.*, 968 A.2d 724, 736 (N.J. Super. Ct. App. Div. 2009) (recognizing that physical damage to covered property "includes loss of function"); *cf. Pepsico, Inc. v. Winterthur Int'l Am. Ins. Co*, 806 N.Y.S.2d 709, 711 (N.Y. App. Div. 2005) ("It is sufficient [to show physical damages to covered property] under the circumstances of this case involving the unmerchantability of beverage products that the product's function and value have been seriously impaired, such that the product cannot be sold."). Even so, an intangible or incorporeal loss that is unaccompanied by a distinct, demonstrable,

physical alteration of the property is not considered a direct physical loss. 10A Steven Plitt et al., Couch on Insurance § 148:46 (3d ed. 2020).

GAIC contends that several facts show that there was no overpressure and, thus, no direct physical loss to Compass's equipment. First, the in-line transducers recorded the pressure once every second and showed that at the time of the accident, the pressure was no higher than 8,800 psi. But the evidence also showed that because the pressure weight moves at the speed of sound, the in-line transducers' readings would not have caught the pressure spike if it occurred between readings. And three pressure transducers on Compass's fluid ends, which were set to disengage at 10,000 psi or higher, disengaged during the accident. The pop-off valve could record pressure up to 15,000 psi and did so at the time of the accident.

Second, GAIC points to Becht's conclusion that the pressure did not exceed the equipment's maximum designed pressure. Several witnesses, in concluding the opposite, questioned Becht's assumptions and resulting analysis. Becht recognized that its analysis was incomplete because it did not have the specifications for GE's property. And Becht's preliminary pressure conclusion was "based on slowly applied pressures," meaning that the pressure at the time of the accident could have been twice that found by Becht's analysis if the pressure had been "dynamically applied." By all accounts (even Herrera's), the accident resulted in a very fast—dynamic— pressure event.

36

Both of these alleged insurmountable deficiencies in Compass's evidence of direct physical loss reveal nothing more than competing views of and conclusions based on the facts. The jury was authorized to weigh and credit this conflicting evidence of direct physical loss as it saw fit. *See Martinez v. Kwas*, 606 S.W.3d 446, 461–62 (Tex. App.—Houston [1st Dist.] 2020, pet. denied). We cannot insert ourselves in a dispute that only a fact-finder may resolve. *See, e.g.*, *Genie Indus., Inc. v. Matak*, 462 S.W.3d 1, 7 (Tex. 2015). In other words, the evidence allowed the jury to reject GAIC's theory that there was no overpressure and, therefore, no direct physical loss. *See Hutchison v. Pharris*, 158 S.W.3d 554, 568 (Tex. App.—Fort Worth 2005, no pet.).

So was there legally sufficient evidence that Compass's covered property suffered a direct physical loss? Yes. There was evidence (albeit, contradicted evidence) that all of the equipment at the Skeeter well had experienced an overpressure incident, powerful enough to damage a connector joint that had been tested to withstand up to 22,500 psi before that level of failure would occur. Such an overpressure event would have caused metallurgical changes in all the connected equipment such that none could have been recertified for use.[17] Indeed, Cinco would

---

[17]GAIC complains that there is no physical evidence of any metallurgical changes to Compass's pipe. But Stone testified that any such changes could only be detected with destructive testing, which would render any such testing an exercise in futility. As Stone put it, "[I]f you suspect that you need to do destructive testing that you already have junk iron on your hand[s], you might as well cut to the chase and get rid of it."

37

not allow that equipment to be used at the Skeeter well and suspended operations until it could be removed.  And the manufacturer would not even attempt to inspect such pipe to determine if it could be recertified and specifically told Compass shortly after the accident to destroy its equipment from the Skeeter well because it was unfit for any use other than "fence post."  For these reasons, each subcontractor at the Skeeter well eventually destroyed its equipment.  Further, Stone and Love testified that even if working pressure is unknown, the equipment still cannot be used again if overpressure is suspected.  This is more than a scintilla of evidence that Compass's equipment suffered a direct physical loss, which was tangible, as a result of the accident.  Because there is some evidence about which reasonable minds could differ in finding that there was a direct physical loss, implicating GAIC's contractual duty, our "review is complete."  *Diamond Offshore Mgmt. Co. v. Horton*, 193 S.W.3d 76, 79 (Tex. App.—Houston [1st Dist.] 2006, pet. denied).

## C.  Unfair Settlement Practices Committed Knowingly

The jury found that GAIC knowingly engaged in three unfair settlement practices: (1) refusing to pay Compass's claim without conducting a reasonable investigation, (2) failing to affirm or deny coverage within a reasonable time, and (3) failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of Compass's claim after GAIC's liability became reasonably clear.  *See* Tex. Ins. Code Ann. § 541.060(a)(2)(A), (4)(A), (7); *see also* 28 Tex. Admin. Code § 21.203(4), (10), (15) (2020) (Tex. Dep't of Ins., Unfair Claims Settlement Practices).

In its third issue, GAIC argues that the evidence was legally insufficient to prove that GAIC's conduct was knowing, rendering the award of additional damages improper. *See* Tex. Ins. Code Ann. § 541.152(b). GAIC does not attack the jury's findings that GAIC engaged in unfair settlement practices.

The trial court defined knowingly as "actual awareness of the falsity, unfairness, or deceptiveness of the act or practice on which a claim for damages is based. Actual awareness may be inferred if objective manifestations indicate that a person acted with actual awareness." Neither GAIC nor Compass objected to this definition, and it tracked the Insurance Code's definition of knowingly. *See id.* § 541.002(1); *United Nat'l Ins. Co. v. AMJ Invs., LLC*, 447 S.W.3d 1, 12 (Tex. App.—Houston [14th Dist.] 2014, pet. dism'd); *see also* Tex. Bus. & Com. Code Ann. § 17.45(9) (DTPA's similar definition of knowingly). Thus, our sufficiency analysis is guided by this statutory definition. *See Osterberg*, 12 S.W.3d at 55; *United Nat'l*, 447 S.W.3d at 12. The Insurance Code's definition is identical to the common-law, bad-faith standard; thus, we find cases applying the bad-faith standard to be pertinent to our inquiry here. *Mid-Century Ins. Co. v. Boyte*, 80 S.W.3d 546, 549 (Tex. 2002) (per curiam); *Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 55 (Tex. 1997).

A knowing statutory violation requires a heightened level of awareness at the time of the conduct:

> "Actual awareness" [for purposes of the DTPA's similar definition of "knowingly"] does not mean merely that a person knows what he is doing; rather, it means that a person knows that what he is doing is false,

39

deceptive, or unfair. In other words, a person must think to himself at some point, "Yes, I know this is false, deceptive, or unfair to him, but I'm going to do it anyway."

*St. Paul Surplus Lines Ins. Co. v. Dal-Worth Tank Co.*, 974 S.W.2d 51, 53–54 (Tex. 1998) (per curiam) (op. on reh'g); *see* Tex. Ins. Code Ann. § 541.002(1). This heightened intent does not require direct evidence but may be inferred from circumstantial evidence of GAIC's intent. *See USAA Tex. Lloyd's Co. v. Griffith*, No. 13-17-00337-CV, 2019 WL 2611015, at *11 (Tex. App.—Corpus Christi June 26, 2019, pet. filed) (mem. op.); *cf. Main Place Custom Homes, Inc. v. Honaker*, 192 S.W.3d 604, 626 (Tex. App.—Fort Worth 2006, pet. denied) (recognizing utility of circumstantial evidence to show knowing conduct under the DTPA); *K.C. Roofing Co. v. Abundis*, 940 S.W.2d 375, 377 (Tex. App.—San Antonio 1997, writ denied) (same). Further, knowledge of industry standards may be imputed to one who does business in that industry when assaying a statutory violator's intent. *Cf. Parkway Co. v. Woodruff*, 857 S.W.2d 903, 912 (Tex. App.—Houston [1st Dist.] 1993) (holding same in context of DTPA), *aff'd on other grounds*, 901 S.W.2d 434 (Tex. 1995).

Before we test the jury's knowing findings against the evidence, we are mindful that jury findings, even findings regarding bad faith or knowing conduct, are accorded great weight and cannot be overturned based on our subjective view of the evidence:

> Were we the trier of fact in this case, we may well have concluded that [the insurer] did not act in bad faith. That determination is not ours to make, however. Instead, the [Texas] Constitution allocates that task to the jury and prohibits us from reweighing the evidence . . . . Accordingly, viewing the evidence in the light most favorable to the

40

[insureds], we hold that there is some evidence to support the jury's finding that [the insurer] denied the [insureds'] claim in bad faith.

*State Farm Lloyds v. Nicolau*, 951 S.W.2d 444, 450 (Tex. 1997). With this deference dictated by the no-evidence standard of review in mind and for the following reasons, we overrule GAIC's third issue.

## 1. Knowing Refusal to Pay Without Conducting a Reasonable Investigation

Regarding no reasonable investigation, GAIC asserts that the evidence showed only that Compass disagreed with the result of GAIC's investigation, not that GAIC knew its investigation was false, deceptive, or unfair. In other words, GAIC contends that Compass's evidence showed only a negligent investigation, not a knowingly false one.[18] *See, e.g.*, *Dal-Worth*, 974 S.W.2d at 54.

When Beaver received Compass's claim, he was aware Compass had destroyed its equipment but immediately hired LWG to conduct an investigation into the possible pressure during the accident. Although Beaver previously had used LWG in claims involving "elevator things," lightning damage, and medical-diagnostic

---

[18]To the extent GAIC argues that there is no evidence of a knowing violation because no evidence supports the jury's no-prejudice and breach-of-the-policy findings, we have rejected these arguments. *Cf. Ortiz v. State Farm Lloyds*, 589 S.W.3d 127, 134 (Tex. 2019) (recognizing insured who establishes right to benefits under policy is entitled to recover damages for statutory violation). Further, we reject GAIC's arguments that Compass did not prove its damages were caused by an unfair settlement practice. Such inquiries go to the sufficiency of the evidence to support the commission of an unfair settlement practice, which GAIC does not challenge. *See, e.g.*, *Certain Underwriters at Lloyd's, London v. Prime Nat. Res., Inc.*, No. 01-17-00881-CV, 2019 WL 7044667, at *16–17 (Tex. App.—Houston [1st Dist.] Nov. 26, 2019, no pet.).

equipment, he had never used LWG to investigate an oil-and-gas claim; in fact, neither Beaver nor LWG had relevant experience in such investigations. Even though he acknowledged his lack of experience in adjusting oil-and-gas-operations and fracking claims, Beaver did not engage an independent adjuster. Raymond testified that LWG's engineers did not have a basic understanding of fracking operations.

Neither Beaver nor LWG talked to witnesses to the accident, which Compass's insurance expert Biello testified was like hiring an accident reconstructionist for a car-accident claim without interviewing the insured or any witnesses. Compass gave GAIC its incident report showing who those witnesses were. One of those witnesses stated at the scene that the equipment had been overpressurized by the accident. Neither Beaver nor LWG talked to GE or FMC before LWG issued its report even though (1) Beaver told his supervisors that LWG's focus was how "the loss occurred" and (2) LWG later realized that it needed to know the specifications and sizing for the equipment at the Skeeter well to estimate the pressure at the time of the accident.[19] Indeed, LWG incorrectly assumed that the master valve would close within ten to twenty seconds (it would close in, at most, two seconds) and relied on ASME's standards instead of the standards dictated by the manufacturer (the American Petroleum Institute's standards). Beaver testified that his and LWG's sole focus was

_____

[19]At trial, Beaver testified that he did not talk to eyewitnesses because what happened was irrelevant and that he believed GE and FMC had no relevant information that would affect the coverage decision.

42

whether the equipment had been physically damaged and that any other facts, such as the circumstances leading to the alleged damage, were irrelevant even though LWG specifically asked for some of this information once it saw Compass's post-denial documents. Further, GAIC never told Compass during its seven-month investigation that Compass's delayed claim or the inability to inspect the equipment prevented a physical-damage conclusion. In fact, GAIC was able to pay Compass for the leased equipment based on pictures of the leased pipe and connector joint.

And in reaching its pressure conclusion for GAIC, an LWG engineer stated to another LWG engineer, both of whom signed LWG's resulting report, that his no-overpressure conclusion, while not "simple," would be "like[d]" and was a reasonable "story." Biello testified that this indicated LWG was manipulating the report to achieve a desired result for its frequent client, GAIC. Beaver recognized that an adjuster should not like or dislike the outcome of an investigation: "[P]redetermined conclusions would be unfair." Even though Beaver stated he did not see LWG's "like" comment, he had set and supervised the scope of LWG's assignment.

But even if LWG's result could not be seen as having been predetermined or skewed based on a desired result, Beaver made no attempt to have LWG recalculate its pressure conclusion based on the information Compass gathered from GE, Cinco, StrataGen, and FMC and furnished to GAIC after GAIC denied the majority of Compass's claim. *See Wilson*, 168 S.W.3d at 818 ("[W]hile an insurer's reliance on an expert report may foreclose bad faith recovery, it will not do so if the insurer had

43

some reason to doubt the report."). LWG recognized that Compass's additional, post-denial information "generated some additional questions" that could "impact" its original pressure conclusion. Beaver testified that neither he nor LWG had contacted GE to get this needed information before GAIC's coverage determination because Beaver assumed GE would not cooperate and because Beaver believed GE did not have relevant information. Additionally, the failure to contact StrataGen before LWG's report and before GAIC's coverage denial meant vital data about the equipment and the pressure at the Skeeter well was not considered. Indeed, this additional data from StrataGen and GE was part of the information that led Stone, Love, and GE to conclude that the accident caused dynamic, extreme overpressure, necessarily causing direct physical loss to Compass's equipment. LWG's report, on the other hand, was based on insufficient facts to make the conclusion it reached, which LWG recognized when it posited "additional questions." Compass answered these questions; but Beaver, who like LWG was inexperienced in oil-and-gas matters, did not ask LWG to revise its report. Instead, Beaver was satisfied with the report's conclusion that was, by all accounts, based on incomplete information.

In sum, GAIC's conduct was not just negligent; it showed (at least circumstantially) an actual awareness that its investigation and resulting denial were unreasonable and not based on all the facts. *See State Farm Fire & Cas. Co. v. Simmons*, 963 S.W.2d 42, 44–47 (Tex. 1998); *Nicolau*, 951 S.W.2d at 447–50. Even GAIC's insurance expert testified that how an insurer conducts its investigation and whom it

44

hires to render an expert opinion factor into whether or not an insurer acted knowingly. The evidence, or at least more than a scintilla of evidence, showed that GAIC knew or should have known that the information it relied on in denying coverage was incomplete and, therefore, unreliable. *See Giles*, 950 S.W.2d at 57. *See generally Republic Ins. Co. v. Stoker*, 903 S.W.2d 338, 341 (Tex. 1995) (holding error in insurer's handling of claim was not basis for bad-faith liability if correct handling would have produced same result). Thus, we conclude that the evidence constituted more than a scintilla that GAIC knowingly denied coverage without conducting a reasonable investigation, allowing a reasonable jury to find that GAIC's conduct—its objective manifestations—was knowing. *See, e.g.*, *Nicolau*, 951 S.W.2d at 448; *Nat'l Sec. Fire & Cas. Co. v. Lampson*, No. 09-15-00299-CV, 2016 WL 7018302, at *12 (Tex. App.—Beaumont Dec. 1, 2016, pet. denied) (mem. op. on reh'g); *United Nat'l*, 447 S.W.3d at 12–13; *State Farm Lloyds v. Hamilton*, 265 S.W.3d 725, 735–37 (Tex. App.—Dallas 2008, pet. dism'd); *State Farm Lloyds v. Johns*, No. 05-96-01039, 1998 WL 548887, at *8 (Tex. App.—Dallas 1998, no pet.) (not designated for publication); *cf. Prime Tex. Surveys, LLC v. Ellis*, No. 01-19-00372-CV, 2020 WL 6065441, at *6 (Tex. App.—Houston [1st Dist.] Oct. 15, 2020, no pet.) (mem. op.); *Horak v. Newman*, No. 03-05-00170-CV, 2009 WL 2195429, at *14–15 (Tex. App.—Austin July 21, 2009, no pet.) (mem. op.); *CA Partners v. Spears*, 274 S.W.3d 51, 72–73 (Tex. App.—Houston [14th Dist.] 2008, pet. denied); *Dal–Chrome Co. v. Brenntag Sw., Inc.*, 183 S.W.3d 133, 141–42 (Tex. App.—Dallas 2006, no pet.).

45

## 2. Knowing Failure to Settle After Liability Became Reasonably Clear

GAIC asserts that because there was a bona fide coverage dispute, Compass cannot, and did not, show that GAIC's failure to settle the claim was done knowingly after its liability was reasonably clear. It contends that it "raised a bona fide dispute" that Compass breached the policy, causing prejudice to GIAC, and that the equipment had not suffered physical damage; thus, Compass failed to prove that GAIC knew liability was reasonably clear. In sum, GAIC asserts that knowing conduct cannot be found if there was a bona fide coverage dispute.

We disagree that a bona fide coverage dispute absolutely bars a finding that the insurer acted knowingly. The Texas Supreme Court recognized that it has "never held that the mere fact that an insurer relies upon an expert's report to deny a claim automatically forecloses bad faith recovery as a matter of law." *Nicolau*, 951 S.W.2d at 448. Thus, the question remains whether the jury's finding that GAIC knowingly failed to settle the claim after liability became reasonably clear was supported by legally sufficient evidence. Whether liability is reasonably clear for purposes of a knowing finding is objectively judged by the facts before the insurer at the time it denied the claim. *See Viles v. Sec. Nat'l Ins. Co.*, 788 S.W.2d 566, 567 (Tex. 1990). Those facts must equate to more than a scintilla that there was no reasonable basis to deny or delay payment of the claim. *See Weiser-Brown*, 801 F.3d at 526. *See generally* William T. Barker, *Evidentiary Sufficiency in Insurance Bad Faith Suits*, 6 Conn. Ins. L.J. 81,

86–111 (2000) (discussing application of Texas's no-evidence review to bad-faith finding against insurer).

Here, there was more than a scintilla of evidence that GAIC lacked a reasonable basis to deny Compass's claim for direct physical loss. Although GAIC relied on LWG's report to conclude that there was no direct physical loss to Compass's property, the report was not based on all the necessary facts to make such a conclusion. Beaver failed to investigate the claim at all other than to hire LWG, which had never performed a causation analysis for a fracking-operations loss. Beaver, who also had no experience in oil-and-gas matters, merely assumed LWG would have experienced engineers to handle such an investigation, and LWG did not tell him otherwise. Raymond stated that it was obvious LWG's engineers had no knowledge of even the basic terminology of oil-and-gas operations. Indeed, LWG seemed eager to reach a conclusion that would be "like[d]" and, again, later recognized that its conclusion should be revised based on several "dispositive," missing facts, which Beaver had never tried to investigate. Even so, Beaver did not ask LWG to revise its report and he was "happy" with how he had adjusted the claim.

Although a bona fide coverage dispute that precludes a knowing finding can be established through evidence of an insurer's reliance on an expert report, there was more than a scintilla of evidence that LWG's report was outcome oriented or influenced by LWG's desire to please GAIC. And Beaver did no investigation of the facts as part of his adjustment of Compass's claim. This is legally sufficient evidence

47

to support the jury's finding of a knowing violation—that there was no reasonable basis for GAIC to deny or delay payment. *See Nicolau*, 951 S.W.2d at 448; *United Nat'l*, 447 S.W.3d at 12; *Hamilton*, 265 S.W.3d at 735–37; *Johns*, 1998 WL 548887, at \*8; *cf. Weiser-Brown*, 801 F.3d at 526–27 (finding insufficient evidence of a knowing violation where no evidence showed investigation was outcome oriented or that insurer failed to recognize weaknesses in expert's report).

### 3. Knowing Failure to Determine Coverage in a Reasonable Time

Compass argues that based on the amount of actual damages found by the jury and because of the statutory damages cap, *see* Tex. Ins. Code Ann. § 541.152(b), only two knowing violations need to be based on legally sufficient evidence to uphold the trial court's award of additional damages. Although we have found sufficient evidence to support two knowing violations, we address the third knowing violation found by the jury in an abundance of caution.

GAIC briefly contends that the evidence shows that any delay in determining the majority of Compass's claim was not covered under the policy was attributable to Compass and its destruction of the equipment; thus, no evidence shows that the length of the delay was occasioned by GAIC's knowing conduct. We will be just as brief. Biello testified that GAIC had all the information it needed to determine coverage on November 7, 2013, yet it did not deny the majority of Compass's claim until May 2, 2014, nearly six months later. The jury found that GAIC had received "all items, statements, and forms it reasonably requested from Compass that were

48

necessary to decide whether to accept or reject the claim" on November 7, 2013. GAIC does not challenge this jury finding.

GAIC knew soon after the claim was filed that at least some of the equipment had been destroyed because of a suspected overpressure incident. But GAIC could have inspected FMC's equipment at that point if either Beaver or LWG had contacted FMC. Even though the FMC equipment was available for inspection, even though GE had information that LWG stated was necessary to determine direct physical loss to Compass's equipment, and even though Beaver initially recognized (but later denied) that how the accident happened was a necessary fact to determine direct physical loss, Beaver was happy with how he adjusted the claim and would not have done anything differently.

The jury was entitled to infer from the evidence, which was more than a scintilla, that GAIC had actual awareness of the falsity, unfairness, or deceptiveness of its refusal to determine coverage until six months after it had all the information it needed to make such a determination. *Cf. United Nat'l*, 447 S.W.3d at 12 (finding evidence sufficient to show actual awareness based on communications between insurer and insured because "the jury reasonably could conclude that those communications support an inference of knowing misconduct").

### III. OFFSET

In it fourth issue, GAIC contends that the trial court erred by failing to grant it a credit against the damages found by the jury for the amount of Compass's

49

settlement with GE, resulting in Compass's receiving a double recovery or more than one satisfaction for its damages. GAIC requested the settlement credit and introduced Compass's settlement agreement with GE; however, the trial court did not apply a settlement offset credit in the judgment, which GAIC asserts is a presumed credit that Compass failed to rebut.

We review the applicability of the settlement credit de novo. *See Sky View at Las Palmas, LLC v. Mendez*, 555 S.W.3d 101, 108 & n.8 (Tex. 2018). A nonsettling defendant seeking a settlement credit under the one-satisfaction rule has the burden to prove its right to such a credit, which is met by introducing into the record evidence of the settlement amount. *Id.* at 107–08. GAIC introduced the settlement agreement into evidence; thus, a presumption arose that GAIC was entitled to an offset. The burden then shifted to Compass to show that certain amounts should not be credited because of the settlement agreement's allocation. *Id.* Compass can meet this burden by presenting evidence showing that the settlement proceeds are allocated among defendants, injuries, or damages such that entering judgment on the jury's award would not result in a double recovery for Compass. *Id.*

Compass and GE's settlement agreement covered Compass's claims against GE "relating to property damaged during what has been referenced as the Skeeter well incident that occurred on or about May 14, 2013 ('the Incident')." Compass's express intention was to "deprive itself of all claims, . . . loss[,] or damage . . . (except those against [GAIC]) for damage to property that directly or indirectly arise from the

50

Incident." Thus, it is clear that GE's settlement was directed to the same loss that was considered and determined by the jury regarding Compass's claims against GAIC. *See First Title Co. of Waco v. Garrett*, 860 S.W.2d 74, 79 (Tex. 1993). Compass argues that the jury's determination of damages did not make it whole; thus, it did not receive a double recovery in the absence of an offset. But Compass's actual damages for the direct physical loss to its covered property were determined by the jury, and the settlement Compass received from GE addressed those same damages. Thus, the trial court should have offset the settlement amount against the actual damages found by the jury. We therefore sustain GAIC's fourth issue.

## IV. CONCLUSION

Although the evidence was hotly contested regarding whether GAIC breached its contract with Compass, it was legally sufficient to support the jury's findings that GAIC wrongfully denied coverage for the direct physical loss to Compass's covered property and that GAIC was not prejudiced by Compass's breaches. Similarly, and even though we might have viewed the evidence differently, the evidence was legally sufficient to allow the jury to infer that GAIC knowingly committed unfair settlement practices. We therefore overrule GAIC's first three issues.

However, Compass's settlement agreement with GE reflects that the settlement amount compensated Compass for the same damage to its covered property that was submitted to the jury. Accordingly, GAIC was entitled to an offset of the amount of GE's settlement against the actual damages awarded by the jury. We therefore sustain

51

GAIC's fourth issue. We reverse the trial court's award of actual damages and remand that award to the trial court to apply the settlement credit and to recalculate the penalties and interest on this amount of actual damages as needed. *See* Tex. R. App. P. 43.2(d), 43.3(a). We also reverse the award of statutory additional damages to recalculate that amount in light of the reduced actual-damages award and the statutory cap. *See* Tex. Ins. Code Ann. § 541.152(b). We affirm the remainder of the judgment. *See* Tex. R. App. P. 43.2(a).

/s/ Lee Gabriel

Lee Gabriel
Justice

Delivered: December 17, 2020